GRAVOIS PLANING MILL COMPANY,
Charles A. and Florence Beckemeier,
Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16646.

United States Court of Appeals
Eighth Circuit.

Feb. 14, 1962.

Robert H. Batts, St. Louis, Mo., Rassieur, Long & Yawitz, St. Louis, Mo., on the brief, for petitioners.

Harold M. Seidel, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and

Robert N. Anderson, Attorney, Dept. of Justice, Washington, D. C., on the brief, for respondent.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

BLACKMUN, Circuit Judge.

This petition for a review of decisions of the Tax Court concerns deficiences determined in the respective 1954 income taxes of Gravois Planing Mill Company ("Gravois"), the corporate taxpayer, and Charles A. Beckemeier and his wife, the individual joint-return taxpayers. The two cases were consolidated for trial. The Tax Court's decisions were in favor of the Commissioner. T.C. Memo. 1960–122.

The controversy arises out of Beckemeier's disposition of his Gravois shares to the corporation itself. Specifically the issues are:

1. Are attorneys' fees and other expenses incurred and paid by Gravois in 1954 in connection with the acquisition of its own stock from Beckemeier deductible as "ordinary and necessary expenses" of its business within the meaning of § 162(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162(a)? [1]

2. Is Beckemeier entitled [2] to a deduction for depreciation of improvements on real estate (conveyed to him by Gravois as part of the consideration for his shares) for the entire taxable year 1954 or for only the period after March 2, 1954?

3. Is the "fair market value",[3] for Beckemeier's capital gain purposes,[4] of a paid-up insurance policy on Beckemeier's life (also transferred to him by Gravois in 1954 as part of the consideration for his shares) the then replacement value thereof or its value as negotiated by Beckemeier and the corporation?

The first issue thus concerns the corporation; the other two concern Beckemeier.

The facts are not in basic dispute and many of them have been admitted by the pleadings or stipulated. Because the Tax Court opinion is not officially reported, we necessarily review those facts in some detail:

Gravois is a Missouri corporation organized in 1893. Beckemeier was born in 1886 and thus was 67 years of age at the beginning of 1954, the taxable year in question. He first acquired stock in

1. "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *".
§ 162 is one of several sections contained in Chapter 1, Subchapter B, Part VI, of the 1954 Code. It is applicable to the entire calendar year 1954, § 7851(a) (1) (A) of the 1954 Code, 26 U.S.C.A. § 7851(a) (1) (A). On the other hand, as the facts disclose, the controversy also centers in what is claimed to be a partial liquidation of Gravois effected in 1954 but prior to June 22, 1954. Subchapter C of Chapter 1 of the 1954 Code, relating to corporate distributions and adjustments, was generally effective only after June 21, 1954, §§ 391–395, 26 U.S. C.A. §§ 391–395 (and, in particular here, § 392(a) of the 1954 Code, 26 U.S.C.A. § 392(a)). Consequently, so far as we are concerned with the statutory definition of partial liquidation and the nature of the corporate transaction here involved, we must look to the applicable provisions of the Internal Revenue Code of 1939, as amended.

2. Under § 167 of the 1954 Code, 26 U.S. C.A. § 167.

3. Within the meaning of § 1001(b) of the 1954 Code, 26 U.S.C.A. § 1001(b), reading:
"The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *"
§ 1001(b) is contained in Subchapter O of Chapter 1. By § 7851(a) (1), this section is applicable to the entire calendar year 1954. In any event, the phrase "fair market value of the property (other than money) received" also appear in the predecessor § 111(b) of the 1939 Code, 26 U.S.C.A. § 111(b) and is subject to the same interpretation.

4. Under §§ 1001(a), 1201(b) and 1202 of the 1954 Code, 26 U.S.C.A. §§ 1001 (a), 1201(b), 1202.

Gravois in 1913 and was an officer of the corporation for many years prior to 1954. From 1945 to 1953, inclusive, and as of January 1, 1954, Gravois had outstanding 400 shares of capital stock held as follows: Charles A. Beckemeier, 200; H. C. Diringer, 75; M. R. Landgraf, 50; R. C. Goetting, 75. All the shareholders were active in the business. Diringer, Landgraf and Goetting were younger than Beckemeier and had come to work with him there after they finished high school. The outstanding shares were subject to a buy-and-sell agreement, of the usual kind, entered into by the shareholders and the corporation in 1945 and amended from time to time. This recited that the parties desired to provide against any of the Gravois stock falling into the hands of persons inimical to the interests of the corporation and of its shareholders. The shareholders agreed that if any one of them wished to transfer any of his shares, the intended seller must give the first refusal to the corporation and the next to the other shareholders. Similar provisions covered the exigencies of death, bankruptcy, and the like. The parties agreed to fix annually a price to be effective under the agreement for the ensuing year with adjustments based on net earnings or net losses for any partial year; if an annual determination was not so made, the last preceding price so fixed was to govern, with adjustments accordingly for the interim. No price fixing formula, however, was provided. Any purchase under this agreement was to be for cash. The parties fixed the price annually through 1951; in February 1952 it was set at $1,000 a share except that in the event of Beckemeier's death the price for his stock was to be $900 per share.

In September 1953 Beckemeier decided to retire from the business. He mentioned this initially to Diringer, who was secretary and later president of the corporation; there were various discussions with the other shareholders, and among them all, during the fall and early winter of 1953. Beckemeier during the latter part of that year also discussed his proposed retirement with Charles D. Long, an attorney. Beckemeier told Diringer that he would sell his stock for $1,000 net per share. Landgraf, who, as noted above, then owned only 50 shares as compared with Diringer's and Goetting's 75 shares each, approached Beckemeier about purchasing 25 shares so that he, too, would have 75. Prior to December 31, 1953, all the shareholders agreed informally (a) to the sale by Beckemeier of 25 shares to Landgraf and (b) to the payment by the corporation to Beckemeier of $1,000 net per share for his remaining 175 shares. This was to be as of December 31, 1953, or January 1, 1954.

The corporation, however, did not possess sufficient cash to cover the purchase price of the 175 shares. Still before December 31, 1953, Beckemeier advised the other shareholders that he would accept land and its improvements owned by the corporation in part payment for those shares. The others agreed. By January 1, 1954, the transfer value of the improvements had not finally been agreed upon; the parties, nevertheless, tentatively valued them at $95,000.

The corporation was also the owner and beneficiary of a paid up life insurance policy on Beckemeier's life. This was carried in its books at cash surrender value. The officers and shareholders intended to surrender this policy and use its cash proceeds for the payment to Beckemeier. During the 1953 negotiations, however, Beckemeier offered to take the policy in lieu of cash to the extent of its cash surrender value and suggested writing the insurance company to ascertain that value. The other shareholders agreed to this.

Thereafter, the following events took place chronologically:

1. December 31, 1953. Beckemeier went off the Gravois payroll. He received no further salary or other compensation from the corporation after this date.

2. January 2, 1954. Beckemeier sold 25 shares of his Gravois stock to Landgraf for $25,000.

3. January 4, 1954. The corporation retained Mr. Long's law firm.

4. January 11, 1954. A regular meeting of the shareholders of the corporation took place. The minutes of that meeting recite that Beckemeier, Goetting, Diringer and Landgraf "holding and owning all of the shares of the capital stock of the corporation, were present in person and participated in the meeting", and go on to read as set forth in the margin.[5] Beckemeier was not reelected as a director at that meeting.

5. "The Chairman stated that * * * he desired to bring to the attention of the stockholders a matter which had been informally discussed by C. A. Beckemeier with the other stockholders, and asked Mr. Beckemeier to explain this matter to the meeting. Mr. Beckemeier thereupon stated that he had devoted a considerable number of years of his life to the company, he had reached an age where he felt he should turn the management of the company over to younger men, and he wished, if possible, to give the same opportunity to the three men who are now largely responsible for the successful operation of the business that he enjoyed as a younger man of acquiring the ownership of the company. He stated that he felt that he had reached a period when he wanted to relieve himself of active duties and dispose of his interest in the company. He stated that he desired to offer to the company for liquidation, redemption and cancellation the 175 shares of stock that he still owned in the company, and that while he realized that the company was not in a position financially to distribute to him his entire distributive share in cash, he was willing to accept a distribution of assets of the company, partly in kind and partly in cash, as his distributive share on account of the stock owned by him. He further stated that he was willing to accept for his 175 shares as of January 1, 1954, the real estate of the company, land and building, but exclusive of its machinery, equipment, furniture and fixtures, and other similar assets, which he advised has a fair market value today of $115,200.-00, the life insurance policy which the company carried on his life, which he was advised had a fair market value of January 1, 1954, of $17,915.73, together with the sum of $41,884.27 in cash. He explained that his offer to accept the real estate is conditioned that the company lease said property from him for a term of ten years on a basis which would assure him after allowing for depreciation over a ten-year term, a net annual average return of 5% on his investment if he retained the property for the full term * * *. They all agreed that a conversion of the plant into a one-story operation would probably be forced within a ten-year period * * *. C. A. Beckemeier stated that he was willing that under the terms of the lease to the company, the company would have the option to request him at the end of the ten-year term to remove the present improvements on the property, construct in lieu thereof a one-story building or buildings, and grant the company a ten-year extension of its lease at a rental which would yield him a net annual return of 5% on his investment, or if he should refuse the company's request to remove the improvements and construct such one-story plant on the premises, and extend the lease, the company would have the right to purchase the property at its land value of $19,-200.00 * * *.

"Thereafter, the matter having been thoroughly considered and discussed, on motion duly made and seconded, the following resolution was submitted to the meeting:

"Be It Resolved, that the offer of C. A. Beckemeier to retire from the business and deliver his remaining 175 shares of stock in the corporation to the corporation for redemption, liquidation and cancellation be accepted, and

"Be It Further Resolved, that the directors of the corporation who may be elected at this meeting be instructed and directed to take all appropriate steps necessary to authorize the officers to convey to the said C. A. Beckemeier as at January 1, 1954, the real estate of the company, consisting of its land and building, located at 3026 Juniata Street, in the City of St. Louis, Missouri, assign to him the life insurance policy on his life, now carried by the corporation at its value on January 1, 1954, and pay to him the sum of $41,884.27 in cash, in complete liquidation, redemption and cancellation of the 175 shares of stock owned by him in this company, and that they be further authorized to proceed with decreasing the capital stock of the company by retiring said 175 shares of stock in accordance with the requirements of the

5. January 11, 1954. After the regular meeting of the shareholders a special shareholders' meeting was held to consider the proposal, made by the directors, for a decrease in the corporation's capital stock. All shareholders including Beckemeier were present. Resolutions were adopted decreasing the corporation's capital stock from 400 to 225 shares and authorizing the filing of an appropriate amendment of the articles with the Missouri Secretary of State.

6. January 25, 1954. Beckemeier and Gravois finally agreed, apparently as a result of an independent appraisal, that the improvements were to be applied toward payment of the stock at $96,000 rather than $95,000.

7. January 27, 1954. The insurance company wrote Gravois that the cash surrender value of the policy on Beckemeier's life, with accrued dividends, was $17,915.73 as of December 28, 1953.

8. March 2, 1954. A special meeting of the directors of Gravois took place. We set forth the minutes of that meeting, in order to save space, in the margin.[6] The form of the ten-year lease from Beckemeier to Gravois was presented and approved. Resolutions were also adopted authorizing the corporation to borrow $15,000 each from Diringer, Goetting and Landgraf against the corporation's notes.

9. March 2, 1954. A warranty deed from Gravois to Beckemeier for the im-

Statutes of Missouri, and take all other steps required to fulfill the terms of said offer of C. A. Beckemeier.

"Upon being submitted to a vote, the foregoing resolution was unanimously adopted."

6. "The President stated that all the details had now been worked out so that it was now possible for the company to accept the offer of C. A. Beckemeier for the liquidation, redemption, cancellation and retirement of the 175 shares of the capital stock of Gravois Planing Mill Company owned by him, the proposed lease form had been approved, the reduction in the capital stock had been authorized at the meeting of the sharcholders, and other necessary details considered so that it was now in order to adopt a plan for liquidating and retiring the said shares of C. A. Beckemeier, and he recommended that the Board take appropriate action to authorize the liquidation of said shares, transfer the real estate to C. A. Beckemeier, transfer the insurance policy on his life to him, and pay the balance in cash upon receiving his 175 shares for liquidation, redemption, cancellation and retirement. Thereupon, on motion duly made and seconded, the following resolution was submitted to the meeting:

"Be It Resolved, that the offer and tender of C. A. Beckemeier to surrender to this corporation for liquidation, redemption and cancellation his 175 shares of the capital stock of the company be and the same is hereby accepted, and

"Be It Further Resolved, that the officers of this company be authorized and directed upon receiving said shares for liquidation, redemption, cancellation and retirement, and by way of partial distribution on account thereof, to make, execute, acknowledge and deliver, as of January 1, 1954, to C. A. Beckemeier a general warranty deed, conveying to the said C. A. Beckemeier the following described property * * *, and

"Be It Further Resolved, that the officers of this company be authorized and directed by appropriate assignment, as of January 1, 1954, to transfer, assign and set over to C. A. Beckemeier, as a further partial distribution, the insurance policy carried on the life of the said C. A. Beckemeier at its value on January 1, 1954, and

"Be It Further Resolved, that the officers of this company be authorized and directed to pay to the said C. A. Beckemeier the sum of $41,884.27 in cash as a further partial distribution, with the understanding that all of the foregoing are received by the said C. A. Beckemeier as complete and full satisfaction, in liquidation, redemption and cancellation, of the 175 shares of the capital stock of this company now owned by him, and that said shares of stock be retired in order to reduce the capital stock of this company from 400 shares, par value $100.00 each, or a total par value of $40,000.00, to 225 shares, par value $100.00 each, or a total par value of $22,500.00 as authorized by a meeting of the shareholders held on the 11th day of January, 1954 * * *.

"Upon being submitted to a vote, the foregoing resolution was unanimously adopted."

proved real estate was executed and delivered. It recited that it was made and entered into as of January 1, 1954.

10. March 2, 1954. The lease from Gravois to Beckemeier of the same improved real estate was executed. It covered the term from January 1, 1954, through December 31, 1963, and recited that the lease began "as of the 1st day of January, 1954". The monthly rental it called for was paid by Gravois to Beckemeier beginning January 1, 1954.

11. March 2, 1954. Beckemeier formally transferred his 175 shares of Gravois stock to the corporation. The shares were cancelled on the corporation's stock records on this date.

12. March 3, 1954. An amendment of the corporation's articles was filed with the Missouri Secretary of State as required by V.A.M.S. § 351.195.[7] This had to do with the reduction in the stated capital of the corporation in line with the resolution adopted by the shareholders on January 11, 1954.

13. March 18, 1954. The formal assignment of the life insurance policy from Gravois to Beckemeier was executed.

14. April 2, 1954. Gravois paid $203 to a title insurance company for a certificate of title on the improved real estate transferred to Beckemeier.

15. June 15, 1954. The firm of Rassieur, Long & Yawitz submitted its bill to Gravois for services over the period from January 4, 1954, to March 2, 1954, in the amount of $2,500, plus disbursements of $10.05. The latter consisted of fees for filing the Certificate of Amendment with the Secretary of State and with the City Recorder and for recording the warranty deed. The statement is detailed and describes chronologically services consisting of attendance at conferences, some with Beckemeier and some with all shareholders; legal research; work on the liquidation and stock redemption plan; drafting and revising minutes; drafting waivers of notice; conference with the corporation's accountant; tax advice and preparation of tax opinion; preparation of Certificate of Amendment; drafting lease and deed; examination of zoning law and building code; execution of all papers; and correspondence. This chronology indicates that the minutes of the January 11 meetings were at least revised, if not actually initially prepared, after that date. There is no mention of any services rendered by the law firm prior to January 4, 1954. This bill was paid by Gravois. The law firm made no separate charge to Beckemeier.

Certain other facts are established:

1. It is stipulated that Beckemeier "received the following property and cash from Gravois Planing Mill Company for the 175 shares of the said stock:

| Property | Value |
| --- | --- |
| Cash | $41,884.27 |
| Land | 19,200.00 |
| Improvements | 96,000.00 |
| Insurance policy | (in dispute)" |

2. The corporation was not over-capitalized in 1953 and there was no plan to reduce the size of its business.

3. During the Beckemeier-Gravois discussions there was never any reference to the value of the insurance policy other than in terms of its cash surrender value.

4. In its 1954 return Gravois asserted no deduction for depreciation on the improvements for any part of that taxable year. It had asserted depreciation in its 1953 return.

5. In its 1954 return the corporation claimed as a deduction for ordinary and necessary business expense the sum of $2,713.05 constituting the total of the amounts paid the law firm and the title insurance company. This was disallowed by the Commissioner. That disallowance constitutes the first issue described above.

---

7. As the statute read prior to its repeal and replacement by the substantially similar Laws 1961, H.B. No. 389.

6. In the Beckemeiers' 1954 return they claimed a deduction for a full year's depreciation (or amortization), based on a ten-year remaining life, of the improvements of the land transferred. The Commissioner disallowed one-sixth of this amount attributable to January and February 1954 because Beckemeier "did not acquire the property until March 2, 1954". This disallowance constitutes the second issue described above.

7. In their 1954 return the Beckemeiers reported long-term capital gain on the disposition of 200 shares of Gravois stock. In that return it was represented that the stock was disposed of on March 1, 1954.

8. In computing that 1954 capital gain Beckemeier valued the insurance policy at its cash surrender value of $17,915.73. The Commissioner increased this to its replacement value of $21,639.25. This increase comprises the third issue described above.

As we have noted, the Tax Court sustained the Commissioner on all three issues. We discuss them in turn.

A. *The corporation's claimed business expense deduction.*

The Tax Court observed that, although originally the plan was for Beckemeier to sell his stock to the corporation, the transaction as ultimately consummated literally met the definition of partial liquidation in § 115(i) of the 1939 Code, 26 U.S.C.A. § 115(i).[8] It cited Lucius Pitkin, Inc., 1949, 13 T.C. 547, in support of this conclusion[9] and said:

"As stated, the petitioner contends that there was a partial liquidation, and the respondent on brief does not argue that there was not. He makes no point of the fact that there was a lease back of part of the property to the corporation, or that there was no contraction of the business of the corporation. We conclude that there was a partial liquidation of the corporation under section 115(i) of the 1939 Code and the judicial authorities thereunder".

The Commissioner, however, on this appeal places some emphasis on the cited factors of the lease back and the lack of contraction of the corporation's business. He also mentions the closely held character of the Gravois stock, the buy-and-sell agreement, the lack of cash, the absence of over-capitalization, the continuance in business, the necessary borrowing from shareholders, and substantial rights of repurchase of the real estate. He then argues that there was no liquidation or dissolution but, on the contrary, a reorganization or recapitalization and "an intent to continue the undiminished operation of the business". The Commissioner justifies making this argument now on the familiar rule that a Tax Court decision may be affirmed upon a theory not presented to or considered by that court. Helvering v. Gowran, 1937, 302 U.S. 238, 245–247, 58 S.Ct. 154, 82 L.Ed. 224. Gravois rejoins by pointing out that the Commissioner before the Tax Court took no position against the existence of a partial liquidation but, on the contrary, argued that the transaction in fact was in part a partial liquidation and in part a recapitalization, and that he thus waived or abandoned any theory of absence of partial liquidation. Helvering v. Wood, 1939, 309 U.S. 344, 60 S.Ct. 551, 84 L.Ed. 796; 9 Mertens, The Law of Federal Income Taxation, § 51.26.

---

8. See footnote 1. § 115(i) reads:
"As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock".

9. Accord: Citizens & Southern Nat. Bank v. Commissioner, 5 Cir., 1943, 136 F.2d 406, cert. den. 320 U.S. 752, 64 S.Ct. 57, 88 L.Ed. 447; Johnson, Carvell & Murphy v. Riddell, S.D.Cal., 1959, 173 F.Supp. 214; Dill Manufacturing Co., 1939, 39 B.T.A. 1023, 1030; L. B. Coley, 1941, 45 B.T.A. 405, 415; George F. Jones, 1945, 4 T.C. 854; Union Starch & Refining Co., 1959, 31 T.C. 1041.

■ We are of the view that the situation presented here is even stronger than that in Helvering v. Wood and that it is governed by that case rather than by Helvering v. Gowran. We therefore feel that the Tax Court's conclusion that, under all the facts, a partial liquidation of Gravois was effected in 1954, within the 1939 Code's definition, was a proper one and is not on this appeal to be denied by the Commissioner.[10]

Granting the existence of a partial liquidation, are the disbursements in question deductible? Two established propositions are perhaps starting points:

■ The first is that the expenses of a reorganization or recapitalization do not qualify as ordinary and necessary business expenses. International Bldg. Co. v. United States, 8 Cir., 1952, 199 F.2d 12, 26, reversed on other grounds 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182; Skenandoa Rayon Corp. v. Commissioner, 2 Cir., 1941, 122 F.2d. 268, 271, cert. den. 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556; Missouri-Kansas Pipe Line Co. v. Commissioner, 3 Cir., 1945, 148 F.2d 460, 462. Compare, however, § 248 of the 1954 Code, 26 U.S.C.A. § 248. The theory usually expressed to support this conclusion is that expenditures of this kind have to do with a continuing capital asset. 4 Mertens, The Law of Federal Income Taxation, § 25.35.

■ The second is that attorneys' fees and other expenses incurred in connection with a corporation's *complete* liquidation and dissolution are deductible. Pacific Coast Biscuit Co., 1935, 32 B.T.A. 39, 42–43; Commissioner of Internal Revenue v. Wayne Coal Mining Co., 3 Cir., 1954, 209 F.2d 152; United States v. Arcade Co., 6 Cir., 1953, 203 F.2d 230, 235–236, cert. den. 346 U.S. 828, 74 S.Ct. 48, 98 L.Ed. 352; Braicks v. Henricksen, W.D.Wash., 1942, 43 F. Supp. 254, 261, affirmed, 9 Cir., 137 F.2d 632; E. C. Laster, 1940, 43 B.T.A. 159, 177, affirmed in part and reversed in part on other grounds, 5 Cir., 1942, 128 F.2d 4; Rite-Way Products, Inc., 1949, 12 T.C. 475, 481. The theory most frequently advanced for this conclusion is that expenditures of liquidation do not concern the creation or continuance of a capital asset. 4 Mertens, § 25.35.

It would seem to us to follow from this that the expenses of a partial liquidation are deductible and for the same reasons which support the deductibility of expenses of a complete liquidation. We find, however, that the question has been vigorously at issue in four opinions in three cases. Mills, Estate, Inc., 1951, 17 T.C. 910, reversed in part, 2 Cir., 1953, 206 F.2d 244; Tobacco Products Export Corporation, 1952, 18 T.C. 1100; and Standard Linen Service, Inc., 1959, 33 T.C. 1. The parties here have argued the precedent of these cases at some length and we necessarily refer to them.

Mills Estate concerned a corporation formed to acquire and hold the stock of a California corporation and to acquire and operate certain improved New York City real estate. Later the real estate was sold and as a result thereof the corporation became, for tax purposes, a personal holding company. Consideration was then given to the disposition of the proceeds of the real estate sale. A plan was adopted whereby the corporation's stated capital was reduced and the shareholders received, for their old

10. In this connection it is appropriate to observe that, despite the Commissioner's suggestion to the contrary, some contraction of the corporate activity has been held not to be an essential element of a § 115(i) partial liquidation. Sheehan v. Dana, 8 Cir., 1947, 163 F.2d 316, 319, 173 A.L.R. 684; Stern v. Harrison, 7 Cir., 1945, 152 F.2d 321, 324, cert. den. 327 U.S. 807, 66 S.Ct. 967, 90 L.Ed. 1031; Dill Manufacturing Co., supra, 39 B.T.A. 1023, 1030; Hamilton Allport, 1944, 4 T.C. 401, 403; Union Starch & Refining Co., supra, 31 T.C. 1041, 1045–1046. As some of these cases correctly point out, § 115(i) is primarily concerned with distributions in partial liquidation of the corporation's "stock" rather than with distributions in partial liquidation or cessation of the corporate activity. For what it may be worth, the 1954 Code does make this latter factor relevant. See 1954 Code, § 346(a) and (b), 26 U.S.C.A. § 346(a, b).

certificates, new certificates and cash substantially equal to the sale proceeds. In connection with all this, legal fees and expenses were incurred. Judge Raum noted the two lines of cases referred to above and said, p. 915 of 17 T.C.:

> "The expenditures involved herein have characteristics that partake of both lines of decisions. Petitioner's legal expenses were undoubtedly incurred in substantial part in order to amend its charter and reduce authorized capitalization, thereby providing for the acquisition and retirement of its stock followed by the issuance of new stock in reduced amount. This aspect of the transaction certainly brings the case within the first line of authority. However, the actual distribution of assets in partial liquidation was also a significant factor with respect to which the legal fees were paid, and it is difficult to perceive why the cost of a partial liquidation should be any the less an ordinary and necessary business expense than the cost of a complete liquidation."

Then, finding that the record there "does not furnish any satisfactory basis upon which a precise allocation can be made", he allocated, with a reference to the precedent of Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540, 543–544, the legal fees and expenses half to the recapitalization aspect of the transaction and half to the partial liquidation and held the latter half deductible. The case was reviewed by the entire Court; two judges dissented on the ground that all the expenditures were incident to the reorganization of a continuing corporation and hence were capital in nature and not deductible. We have, thus, a flat holding that legal fees and expenses in connection with a corporation's partial liquidation may be deductible as business expenses.

Tobacco Products followed within the year. The taxpayer corporation there was in the exporting business. It owned another corporation's shares which had no relevance to exporting. That stock was then distributed to its shareholders pro rata and in exchange therefor 90% of the outstanding shares of the taxpayer corporation were surrendered and cancelled. Legal and other expenses were incurred. Here again the Tax Court found that these expenses were equally allocable between the reduction in stated capital and the partial liquidation and allowed the latter half as a deductible business expense. This is a second flat holding.

Then followed the Second Circuit's opinion in the Mills Estate appeal. The court reversed the Tax Court to the extent it had allowed half of the legal fees and expenses as a deduction. It did so on the ground that all the corporate steps there taken were to be viewed "as a single transaction"; that what occurred "was essentially a reorganization"; that the legal services "were all necessary steps to attain that end"; and that, as it was primarily a reorganization, the expenses were not deductible.[11] The court observed that as a consequence it was not necessary in that case to decide whether the expense of what was a complete or partial liquidation for tax purposes was deductible as a business expense; in that connection it noted in passing that the Tax Court opinions allowing a deduction for expenses of complete liquidation "have not been without dissent" nor without nonacquiescence by the Commissioner.[12]

11. Inasmuch as the taxpayer involved in Tobacco Products filed its return with the New York Collector, any appeal in that case presumably would also have been to the Second Circuit. § 1141(b) of the 1939 Code, 26 U.S.C.A. § 1141(b). It is interesting to speculate on what might have happened had Tobacco Products been appealed at that time by the Commissioner.

12. Citing only the two nonacquiescences in Pacific Coast Biscuit Co., supra, XIV–1 C.B. 35 (1935) and 1937–1 C.B. 45, and that in Mills Estate, 1952–1 C.B. 6. It is to be noted now, however, that since the

In Standard Linen, decided in 1959, the Tax Court concluded that a partial liquidation was effected. The deduction of certain expenses claimed to be attendant upon that liquidation was in issue. Judge Tietjens said, pp. 16–17 of 33 T. C.:

"The weakness in petitioners' position is that they have failed to establish the nature of these miscellaneous expenditures. While expenditures made in partial liquidation of a corporation may represent ordinary and necessary business expenses, they may also represent capital expenditures, depending on the nature of the particular expense. Mills Estate, Inc., 17 T.C. 910 (1951), reversed in part 206 F.2d 244 (C.A. 2, 1953). Thus, a general claim that various expenditures were made in connection with a partial liquidation is insufficient to establish their deductibility as ordinary and necessary business expenses. There must be a further showing that no part thereof represented the cost of a capital item. Failure to make this showing constitutes a failure of proof."

Although this is another recognition that partial liquidation expenses may be deducted, the emphasis is "on the nature of the particular expense". This, we take it, was meant to equate with the Second Circuit's approach in viewing "the entire proceeding * * * as a single transaction".

Assuming, for present purposes, that these decisions are expressive of the applicable law, we gather that they propound that law as follows: Legal fees and other expenses of a partial liquidation may be deductible, within the statutory definition, as ordinary and necessary expenses paid in carrying on the business. Mills Estate (Tax Court), Tobacco Products, Standard Linen. Where, however, a partial liquidation is accompanied by the corporation's recapitalization or reorganization, the transaction is to be viewed as a whole and its dominant aspect is to govern the tax character of the expenditures. Mills Estate (2 Cir.), Standard Linen. Thus, where one has what is essentially "a change in the corporate structure for the benefit of future operations", there is no deduction. Mills Estate (2 Cir.). Of course, where there is a failure of proof by the taxpayer, the deduction fails. Standard Linen.[13]

▪ It may be well to comment briefly at this point upon the nature of a partial liquidation which is other than "one of a series of distributions in complete cancellation or redemption of all" of a corporation's stock, within the definition of § 115(i) of the 1939 Code. Directing one's self to that part of the statutory definition which concerns "a distribution by a corporation in complete cancellation or redemption of a part of its stock", or "one of a series * * * in complete cancellation or redemption of * * * a portion of its stock", one re-

---

Second Circuit's opinion, the Commissioner *has* acquiesced in Pacific Coast Biscuit Co. and has withdrawn his prior nonacquiescences therein. 1954–1 C.B. 6.

13. We are fully aware of the statement in Standard Linen that, as to the expenses claimed, there "must be a further showing that no part thereof represented the cost of a capital item". We are inclined to think, as we have stated, that the author of that opinion intended by this statement to conform his result to the Mills Estate standard of dominant purpose. If we are mistaken as to this, then Standard Linen is a holding that all

expenses of a partial liquidation must be treated as a lump sum which is not deductible if *any* part of that sum was expended for a change in capital structure typically attained through a recapitalization or reorganization. This, of course, in practical application, would disqualify as a deduction most partial liquidation expenses and would effect a departure from the statements to the contrary in Mills Estate (Tax Court) and Tobacco Products. If this is what the Tax Court meant to do in Standard Linen, we are constrained to disagree with it for the reasons suggested in the next succeeding paragraph of the opinion.

alizes from the very definition that there necessarily is a continuation of corporate activity after this kind of partial liquidation. To this extent, therefore, the partial liquidation is inevitably accompanied by a change in corporate structure, and the expenses in connection with the partial liquidation just as inevitably have some connection with the continuing corporate operation, too. But if the premise is sound that partial liquidation expenses may qualify as business expenses,[14] is this result to be defeated for this type of partial liquidation? It might be that a tax distinction between the partial liquidation which is not a part of a complete liquidation, on the one hand, and one which is a part of a complete liquidation, on the other, could be appropriate but, if so, that would seem to be a matter for the legislative and not for the judicial process. What we are saying is that partial liquidation expenses have been held to qualify as deductible business expenses and they are not to be disqualified merely because the particular partial liquidation happens to be one of that kind, recognized by the definition statute, involved in continuing corporate activity.

Still going along with the approach of the four opinions cited, we nevertheless conclude that here, as distinguished from the Second Circuit's conclusion in Mills Estate (with which we express no agreement or disagreement), the dominant aspect of the Gravois transaction was the liquidation of the Beckemeier shares and not the recapitalization. Beckemeier had reached retirement age and had advised Diringer and the other two shareholders of his desire to retire. The stock was closely held. The same protective considerations which led to the buy-and-sell agreement were present in the face of Beckemeier's incipient withdrawal, were buttressed by his natural feelings of loyalty to his younger associates of long standing, and were exemplified by the equalizing sale to Landgraf. Although there was, of course, a desire on the part of all to keep the organization going, the basic problem with which they struggled was that of the disposition of the outstanding Beckemeier stock and was not one directed to the change or any desired improvement in the form of the corporate structure. Stock retirement, that is, partial liquidation, was the problem and it was the essence of what transpired. If the form, content and wording of corporate minutes are of any significance, those of the shareholders' regular meeting of January 11, 1954, and those of the directors' special meeting of March 2, 1954, lend hearty support to this conclusion. The same is true as to the nature of the legal services described in detail in the bill to Gravois. Of course, the transaction involved a reduction in the corporation's stated capital and a continuance of the corporate activity. And of course the amendment of the articles was filed with the Secretary of State as required by the Missouri statutes. These additional facts, however, are necessary concomitants of this type of partial liquidation. We regard them as constituting only a secondary and not the dominant aspect of the entire transaction.

This, then, brings us to the subsidiary matter of proof. There is no question that the legal services were rendered and the expenses were incurred and both were paid by Gravois, and no challenge has been raised as to their propriety or reasonableness. We find nothing in this record to justify a conclusion that any part of these was for the benefit of Beckemeier personally. Any possible inference in that direction is overcome by the fact the corporation's obligation to Beckemeier was for a net price per share and, so far as the title certificate

---

14. Whatever may be the theory, that is, an accounting to the corporate owner, see Weissman, Allowable Deductions on the Formation, Reorganization and Liquidation of a Corporation, 1959, 53 Northwestern University Law Rev. 681, 721–22, 724, or a mere current expense not creating a capital asset, see 4 Mertens, The Law of Federal Income Taxation, § 25.35.

expenditure is concerned, by the fact that the purchase of title insurance was protection for Gravois under its deed warranty.

■ In summary, therefore, on this issue we are content to follow, for purposes of this case, the lead of the Second Circuit in Mills Estate in placing emphasis on the dominant aspect of the transaction, but we conclude that, upon the facts stipulated and proved, the dominant aspect was the partial liquidation and not the recapitalization and that the legal fees and expenses are properly regarded in their entirety as attributable to it.

B. *The period in 1954 for which Beckemeier is entitled to a depreciation deduction.*

Here we are concerned only with January and February 1954. No issue as to the rate of depreciation or as to the termination date of the depreciation period is before us. Neither has the Commissioner challenged Beckemeier's right to a deduction for the remaining ten months of the taxable year.

■ Of course the intent of Beckemeier and Gravois to effect the transaction as of the end of 1953 or as of January 1, 1954, is clear and indisputable; nevertheless, the deed and the lease were not executed until March 2, 1954, after the directors' meeting of that day. In spite of these contrasting facts, we feel that the transaction, from any viewpoint which takes substance and practicalities into account, achieved binding status no later than January 27, 1954, and that the time lag in the directors' meeting and the real estate papers was not significant. The shareholders' meeting of January 11, 1954, purported to effect a formal and binding agreement with Beckemeier; by one of the resolutions then adopted Beckemeier's offer was "hereby accepted". It is apparent, however, and conclusively so, we think, that the definite figures embraced in the January minutes became available and were arrived at only later in that month and that the minutes were written or revised

thereafter accordingly. We are content to hold that the January meeting did complete the agreement except for the determination of those factors and that that determination came along by the end of the month. When this was done, Beckemeier acquired an interest in the improved real estate sufficient to support a depreciation deduction. Compare Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226. The action of the directors at their meeting on March 2, 1954, then becomes no more than confirmatory of what had been done by unanimous shareholder action on January 11 and the subsequent monetary determinations. Futhermore, the corporation's payments of rent beginning January 1, 1954, its non-assertion of depreciation for 1954 and the cessation of Beckemeier's compensation at the end of 1953, are all supporting factors against the critical character of the March date. While perhaps the corporate procedures could have been more helpfully coalesced timewise, a measure of realism is to be the guide here. The Commissioner's disallowance of the deduction for February was improper as a matter of law; his disallowance for January, however, was correct.

C. *The value of the insurance policy.*

Under the governing statute (see footnote 3) the "fair market value" of the paid-up insurance policy transferred to Beckemeier is determinative.

Here the individual taxpayers claim that the policy's value is the price a willing buyer would pay for it to a willing seller when neither acts under compulsion; that the parties here, dealing at arm's length, agreed that the insurance policy would come over as part of the payment for Beckemeier's shares at what the insurer said was its then cash surrender value; that nothing was ever said in the negotiations about replacement value or about anything other than cash surrender value; that replacement value had nothing to do with the negotiations; and that this is shown by the fact Gravois originally contemplated turning the policy in for its cash sur-

render value and using the proceeds to apply on the Beckemeier stock.

The Commissioner's position is that the policy's replacement cost, which was greater than its cash surrender value, should govern. He argues that the right to turn a policy in for cash is only one of the rights an owner possesses; that in addition he has the right to retain it for investment purposes and the right to receive its face amount on the insured's death; and that all these rights demonstrate a value greater than mere cash surrender value. He cites as supporting authority Charles Cutler Parsons, 1951, 16 T.C. 256, and Oberwinder v. Commissioner, 8 Cir., 1945, 147 F.2d 255.

Parsons concerned a taxpayer's exchange of endowment policies for other ordinary and limited life contracts and for a new single premium policy. The question was whether the cost of this last policy or its cash surrender value immediately upon issuance was its "fair market value" under § 111(b) of the 1939 Code. The Tax Court held that the cost was the measure. It is to be noted, however, that the taxpayer there was the insured and that the Tax Court was thus able to say that the policy's fair market value was its cost "agreed upon by the petitioner as a willing buyer and the insurance company as a willing seller".

Oberwinder involved single premium annuity contracts purchased by an employer for employees. These contracts had no cash surrender or loan value during the year of purchase and delivery. The issue was as to the amount of additional compensation the contracts provided for the employees. This court, p. 259 of 147 F.2d, affirmed the Tax Court's determination that the cost of the contracts was the measure of their value at the time of delivery.

The Tax Court in the present case relied on Parsons and also on the gift tax measure of value of a single premium policy as prescribed by Guggenheim v. Rasquin, 1941, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813. It noted that the Beckemeier contract was fully paid up and

saw no difference between it and a single premium policy. It concluded that "Beckemeier in receiving this fully paid $25,000 life insurance policy received valuable rights other than merely the right to surrender the policy for cash. Clearly it was worth more to Beckemeier than its cash surrender value".

█ The policies involved in Parsons, Oberwinder, and Guggenheim were all new, single premium contracts just then sold and issued on the life of the taxpayer concerned. The situation here is different. There was no sale or immediate passage of a new policy from the insurer to Beckemeier. No buyer-seller relationship with the insurer existed and permeated the transaction, and there was a bargaining, not an absence of it, between the tranferor and the transferee. We have the passage of a long-existing policy between Gravois and Beckemeier which is no different than the passage, for example, of tangible personal or real property. In such a case the property's value is not usually the subject of market quotes and is often difficult to ascertain except as revealed by a negotiated transaction. Of course, a given property may actually be "worth more", to use the Tax Court's expression, to one individual than to another. The persuading fact, however, is that the parties here by arm's length negotiating arrived at an agreed evaluation of the policy for purposes of application upon the stock price. On these facts this was its fair market value. While in certain respects the policy might have been "worth more" to Beckemeier, because he happened to be the insured and the transferee, it was at the time worth no more than cash surrender value to Gravois which was otherwise short of immediately needed cash. We cannot with satisfaction distinguish this particular insurance situation from that of any other more usual negotiated property situation. We therefore conclude that as a matter of law the policy's fair market value upon the facts of the partial liquidation here was its value as bargained for and agreed to by the transacting parties.

**212**

The Gravois decision of the Tax Court is therefore reversed with directions to enter a new decision for that taxpayer. The Beckemeier decision is reversed with directions to recompute the deficiency of those individual taxpayers in accord with the conclusions herein expressed.