FALSTAFF BEER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75349, 78613.   Filed December 18, 1961.

*Fred Woodley, Esq.,* for the petitioner.
*H. L. Cook, Esq.,* and *Robert L. Liken, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax as follows:

| Docket No. | Taxable year or period ended July 31— | Amount |
|---|---|---|
| 75349 | 1954 | $4,996.99 |
|  | 1955 | 13,030.13 |
| 78613 | 1956 | 9,801.33 |
|  | 1957 | 1,851.62 |

The only issue for decision is whether payments made by the petitioner to a predecessor distributor of beer are deductible as ordinary and necessary business expenses.

### FINDINGS OF FACT.

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioner is a Texas corporation organized on October 29, 1953.   It filed its income tax returns for the years involved with the

director of internal revenue, Austin, Texas. During the years in question, it was engaged in the business of selling Falstaff beer under a distributorship acquired as hereinafter set forth.

William A. Heusinger entered into the business of the wholesale distribution of beer in the area of San Antonio, Texas, in September 1933. Sometime in 1937 or 1938 the Falstaff Brewing Corporation of St. Louis, Missouri, through its division manager, James S. Mackin, offered him the distributorship of Falstaff beer in Bexar County, Texas, in which San Antonio is located, and he accepted it. There was no written contract between him and the brewing company. The oral agreement did not fix any length of time that he could remain the distributor. It was understood by both parties that the distributorship could be terminated at the will of either party. There was no agreement as to the giving of notice in advance and the understanding was that Heusinger would remain as distributor as long as he wanted to continue and was operating to the satisfaction of the brewing company. This arrangement was in accord with the practice of the Falstaff Brewing Corporation. No agreements were in writing, none was for a definite period of time, and in none of them was there any guarantee against loss of investment or out-of-pocket expenses. It was not the custom of the brewing company to grant either franchises or agencies. The arrangement with Heusinger was not one of agency. The brewing company sold beer to him and he in turn sold it at wholesale to retailers. The brewing company customarily did extensive advertising in order to promote the sales of its beer in the area in which it had a distributorship. While it was understood that the brewing company could terminate a distributorship at will, it was its policy not to terminate without good and sufficient reason. In practice the brewing company had very little turnover of distributors and there had previously been only one termination in the Texas area.

When Heusinger was appointed distributor for the Falstaff Brewing Corporation such beer was not being sold in his area, but other beers were being sold and there was a great deal of local competition. Although there was available through the Texas Liquor Control Board and elsewhere a list of retailers authorized to sell beer, it was necessary for Heusinger to enter into promotional activities in order to obtain accounts for the sale of Falstaff beer. He spent much time, money, and effort in the first 5 years that he had the distributorship to develop a customer demand for this beer. Among the methods used was to have a salesman go into a bar and buy Falstaff beer for patrons. Heusinger employed a relative, Harry Basse, as his sales promotion man. Basse contacted key accounts, chainstores, and Army camps. Falstaff beer was raised in customer popularity to

the extent that at one time it occupied first place in sales of beer in the San Antonio area. The peak of sales was reached in the late 1940's when Heusinger sold 1,500,000 cases of Falstaff beer per year. Thereafter sales declined and in 1953 he sold only about 700,000 cases. Heusinger's volume of sales declined to the extent that Falstaff beer occupied second place in volume of sales of beer in the area and there was danger that it would fall to third place. Throughout the whole period Heusinger continued to expend money for business promotion, this amounting to approximately $25,000 per year in 1952 and 1953.

In the early 1950's when Falstaff beer was losing its place as a market leader in the San Antonio area, the brewing company became concerned and its officials came to the conclusion that it would be necessary for Heusinger to make certain changes in his operations, such as obtaining additional trucks, setting up new routes, and stimulating his sales force to greater efforts. At some time in the latter part of June 1953, Mackin advised Heusinger that the brewing company was dissatisfied with the situation and that Heusinger would either have to conform to their requirements or give up the distributorship. Heusinger advised Mackin that he did not care to invest any additional capital in the business. His health was not good at that time and he advised Mackin that he wanted to sell his business and asked Mackin to find a buyer for him. A "distributor cancellation report" of the brewing company, dated July 18, 1953, and approved July 23, 1953, shows that Heusinger's distributorship was to be canceled effective July 31, 1953, and that Heusinger had been so advised by Mackin by mail. Therein the reason given for cancellation was "Mr. Heusinger asked for us to produce a buyer due to ill health." It was also therein stated that the distributor's attitude toward cancellation was "good," that Heusinger had on hand at the date of the report about a week's supply of beer, and that this would be taken over by the new dealer, who was stated to be John J. Monfrey.

John J. Monfrey had, since December 1949, been in the business of distributing Schlitz beer in the Rio Grande Valley in southern Texas. The potential for beer sales in the Rio Grande Valley in 1953 was about 180,000 to 200,000 cases of beer per year. In March 1953, Monfrey and his partners decided that it would be desirable to become distributors for some well-known beer, such as Falstaff, in a major market. Accordingly, Monfrey contacted Falstaff's division manager, Mackin, and made known his desire to become a Falstaff distributor. Thereafter, in the latter part of June 1953, when Heusinger refused to make the changes in operations requested by Falstaff Brewing Corporation and Heusinger had asked Mackin to find a purchaser, Mackin recalled Monfrey's application and called

Monfrey for a conference. After conferences with representatives of the brewing company, Monfrey was informed, sometime in July 1953, that he was appointed to be the Falstaff distributor for Bexar County.

On July 23, 1953, Falstaff Brewing Corporation wrote Monfrey as follows:

While you have the purchase of the Falstaff distributorship under consideration, we believe that you should be apprised of Falstaff's policy pertaining to a franchise or contract.

Falstaff does not grant a franchise or contract for a given territory or otherwise, and the distributor arrangements with all distributors are terminable at will.

It has not been our practice to arbitrarily terminate distributorships. Normally, when we consider any distributor's operation to be sub-standard, our representative counsels the principal and endeavors to upgrade the operation to a point we feel is satisfactory. We grant, which is in our opinion, a reasonable period of time to achieve the necessary improvements, failing which we terminate the distributor relationship.

Mackin, the author of the above letter, in referring to the "purchase of the Falstaff distributorship," had reference to the purchase by Monfrey of Heusinger's beer on hand, trucks, warehouse, or other property if Heusinger was willing to sell them.

Falstaff Brewing Corporation did not require that Monfrey make any arrangements with Heusinger and did not require that he buy anything from him, although it was suggested to him that he should try to buy Heusinger's remaining supply of Falstaff beer. It was a basic policy of the brewing company not to enter into any negotiations between a distributor and his successor.

Prior to his appointment as the distributor of Falstaff beer for Bexar County, Monfrey had not had any conversations with Heusinger about taking over the distributorship of beer in San Antonio. At the time of his designation as distributor, Monfrey was introduced to Heusinger by the representatives of the brewing company. From that time until the end of July, Heusinger and Monfrey had various conversations with respect to possible purchases of Heusinger's assets.

On July 22, 1953, Monfrey entered into a contract with Heusinger whereby Monfrey agreed to pay to Heusinger the sum of $65,000, payable at the rate of 3 cents per case of Falstaff beer sold by Monfrey within the territory beginning with the month of August 1953, the payments to be made on the first day of each month upon sales made in each preceding month. The contract further provided:

In consideration of which, I, the said William A. Heusinger doing business under the trade name of William A. Heusinger Company, have sold, assigned and delivered and by these presents to [sic] sell assign and deliver to the said John J. Monfrey, all that certain business owned and conducted by me in Bexar

County, Texas, known as William A. Heusinger Company, and consisting of a Falstaff beer distributorship covering Bexar County, Texas, save and except certain territory in the city of San Antonio, Texas, described in memorandum hereto attached; such business being a grant to me by the Falstaff Brewing Corporation of St. Louis, Missouri, of such Falstaff distributorship and Falstaff Beer Sales Agency; hereby granting unto the said John J. Monfrey, all good will and other intangible assets owned by William A. Heusinger Company in operation of such business.

John J. Monfrey here contracts and agrees to operate the business herein assigned to him in a careful and prudent manner, to meet all requirements made of him by Falstaff Brewing Corporation of St. Louis, Missouri, and to pay unto the said William A. Heusinger the sums of money above mentioned on the dates that the same become due; and in the event that the said John J. Monfrey should sell, assign or transfer said business hereinabove described, the successor or assignee shall assume the balance due the said William A. Heusinger, the same to be payable as hereinabove set forth.

The above agreement was prepared by Heusinger's attorney; Monfrey was not represented by counsel. The amount of $65,000 closely approximated Heusinger's net profit for his last year of operation.

The above contract did not pass title to the warehouse, beer inventory, furniture and fixtures, beer trucks, or any other tangible property which Heusinger owned; nor did it transfer the name of William A. Heusinger Company or any operating licenses.

Thereafter Monfrey purchased from Heusinger the beer inventory on hand on July 31 at the wholesale invoice price. At or about July 31 he also purchased from Heusinger at invoice price certain advertising material furnished by the brewing company. Monfrey wanted to purchase Heusinger's warehouse, but Heusinger was unwilling to sell it. Some months later he offered to rent it to Monfrey but Monfrey was unwilling to pay the rental asked.

No records were turned over by Heusinger to Monfrey, but Heusinger advised Monfrey's representative that he had a card system showing all the accounts on each route and this was made available to Monfrey.

The telephone number used by Heusinger was never transferred to the name of Monfrey. Whenever Heusinger received telephone calls for Falstaff beer he advised the callers that Monfrey was the distributor and gave them Monfrey's telephone number.

Shortly before August 1, 1953, Monfrey had a meeting with Heusinger's truck drivers and route men and offered to retain them. As a result, he hired 9 of the 11 drivers, all of whom knew their routes and customers. Monfrey also hired certain of Heusinger's office personnel. Heusinger took no part in those personnel arrangements. Later, at Heusinger's request, Monfrey also employed Harry Basse in a capacity similar to that which he had held in the Heusinger organization. Monfrey obtained information with reference to re-

tailers primarily from the Bexar County Wholesaler's Association with the assistance of the employees of the brewing company.

In all of the foregoing transactions, Monfrey was acting on behalf of a partnership composed of himself, L. R. Baker, and P. F. McNamee, Jr., doing business under the name of Falstaff Beer of San Antonio. The partnership began distributing Falstaff beer on August 1, 1953, without any interruption of deliveries. The partnership invested approximately $100,000 in the enterprise, and continued to expend large sums of money for promotion of the Falstaff name. In accordance with the contract it made payments to Heusinger at the rate of 3 cents per case of beer sold.

On October 29, 1953, the petitioner corporation was formed to succeed the partnership. The partners became the stockholders, but at some subsequent date Monfrey became the sole stockholder and its president and general manager. The petitioner, as successor, continued to make payments to Heusinger at the rate of 3 cents per case of beer sold.

In its income tax return for the taxable period July 16, 1953, to October 31, 1953, the partnership Falstaff Beer of San Antonio reported payments of $3,850.38 made to Heusinger under the contract of July 22, 1953, and this amount was deducted as an ordinary and necessary business expense. In its income tax returns for the taxable period October 29, 1953, to July 31, 1954, the fiscal year ended July 31, 1955, and the fiscal year ended July 31, 1956, the petitioner reported such payments denominated overriding commissions, in the respective amounts of $16,656.63, $25,057.95, and $17,226.11, and deducted them as ordinary and necessary business expenses. In its return for the fiscal year ended July 31, 1957, the petitioner did not report or deduct any payments made as overriding commissions.

In the notices of deficiency the respondent disallowed these claimed deductions on the ground that they did not constitute ordinary and necessary business expenses. In the notice of deficiency for the year ended July 31, 1956, the respondent further stated that the amount in question constituted a cost of acquiring a business and a capital asset.

The payments made by the petitioner in the years in question, pursuant to the contract of July 22, 1953, were not ordinary and necessary expenses paid or incurred in the conduct of the petitioner's business.

## OPINION.

The question presented is whether the payments made in the years in question are deductible as ordinary and necessary expenses paid or incurred in those years in carrying on any trade or business, within

the intendment of section 23 (a) (1) (A) of the Internal Revenue Code of 1939 and section 162 (a) of the Internal Revenue Code of 1954.

The payments were made in satisfaction of the obligation undertaken in the contract of July 22, 1953, to pay $65,000 at the rate of 3 cents per case of beer sold. We are concerned, therefore, with the reason for the agreement to pay the $65,000.

In the contract it is stated that the consideration for the payment of the $65,000 was the transfer by Heusinger to Monfrey of the business owned and conducted by him under the name of William A. Heusinger Company, consisting of a Falstaff beer distributorship and all goodwill and other intangible assets owned by the William A. Heusinger Company in the operation of such business.

The respondent contends that the payments made were, as stated in the contract, for goodwill or other intangible assets, and that as such they are not ordinary and necessary business expenses. He cites *Pevely Dairy Co.*, 1 B.T.A. 385, in which we held that an amount received for the transfer of retail milk routes constituted the cost of goodwill, rather than an ordinary and necessary business expense, stating that where the business consists of service to customers, as in the case of a milk route, the principal thing of value is the goodwill, and that it is not necessary that it be connected with a place of business or a particular article; that in such a situation the goodwill is the probability or expectation of retaining the old customers.

The petitioner contends that since the distributorship was terminable at the will of the brewing company and was in fact terminated by such company and granted to Monfrey, Heusinger did not transfer a going business. It also points out that the contract of July 22, 1953, did not purport to transfer any tangible property and that Heusinger in fact did not transfer the name of his business, "William A. Heusinger Company." The petitioner, therefore, maintains that the $65,000 could not have been paid for goodwill, in view of the general rule that goodwill does not exist by itself, but only as an incident of a business or as it attaches to something tangible. Rather, it is the petitioner's contention that Monfrey undertook to pay the $65,000 in order "to insure a peaceable market" and "to protect the existing market for Falstaff beer and to prevent derogatory influences upon that market," and that consequently the payments constituted deductible ordinary and necessary business expenses.

Petitioner's contention is based upon the testimony of Monfrey. He testified that "in my mind I agreed to pay him [Heusinger] for peace of market just to say that I have got a peaceable transaction to go out and do business myself without competition from another man," and that "it was worth that to me to have peace in the market, to have recognition from the retailer, to have peace with my brewery and to

continue to do business and purchase Mr. Heusinger's beer," and that it was worth the price agreed to be paid "to have the permission to purchase the beer so I could distribute the inventory that he had rather than two of us being in the market." He testified that the payment was made in the light of an experience which he had previously had. He stated that when he took over the distributorship of Schlitz beer in 1949, his predecessor elected to continue to sell the Schlitz beer which he owned, and that as a consequence there were in effect two distributors of beer for a period of several months, that such predecessor made spot deliveries of beer, thereby disrupting the orderly delivery of Schlitz beer and the maintenance of fresh beer on the shelves of the retailers, that he, Monfrey, had to pick up his predecessor's empty bottles and deliver them to the brewery at his own cost, and that all this had resulted in an estimated loss to him of about $22,000 or $23,000 over a period of 3½ or 4 months.

In this connection the general sales manager of the brewing company testified that it was not unusual for a new distributor to make some kind of payment to an old distributor or to his estate, as for example, upon the demise of an owner of a business, that while he does not know what is in the minds of the parties, he knows that it has been done for peaceful transition of the business, that is, to prevent ill will or actions of ill will that might disturb the transition from one to the other, and that he had known of instances where difficulty, such as described by Monfrey, was experienced in changing a distributorship.

Heusinger, on the other hand, while acknowledging that the brewery could terminate his distributorship at will, testified in effect that in negotiating with Monfrey he told him that he wanted to sell his business; that he had spent 16 or 17 hard years building up the sales of Falstaff beer; that he thought he was entitled to $65,000 for goodwill; that his relinquishment of the distributorship was voluntary in that he could have complied with the brewing company's requirements and continued as the distributor; that in the negotiations he made no threats with respect to disturbing the market or refusing to sell his inventory of beer to Monfrey; that he was not the type of person who would do anything to disturb the market; that in any event he could not have materially disturbed the Falstaff beer market because of consumer demand; and that in the negotiations there was not any discussion or understanding about route books, but that he told Monfrey's office man that he had a card system which had a list of all the accounts on each route and that he thought this was copied within 30 days. He further testified:

Q. What do you mean by good will and other intangibles in the contract?
A. It's my understanding that good will is my 16 or 17 years of hard work

that I put in that. I felt that I was entitled to some return on that, and I just had heard good will and that's what it meant to me.

Q. Is that what you represented you were selling to Mr. Monfrey?

A. Yes, sir.

Q. That's what he agreed to buy?

A. That's right.

Monfrey, Heusinger, and officials of the brewing company all testified that a distributorship is terminable at the will of the brewing company, and one of such officials testified that in granting a distributorship there is no agreement by the brewing company that it will reimburse a terminated distributor for loss of investment or out-of-pocket expenses. But whether there would have been any liability on the part of the brewing company to compensate Heusinger upon the termination of his distributorship, or whether Heusinger had any valid legal claim to any asset which was salable, is not necessarily determinative of the issue presented. It is not unusual for payment to be made pursuant to a claim where the right may be doubtful. In such cases it would seem reasonable to conclude that the amount paid takes on the character of the claim.[1] There is no evidence whatever that Heusinger and Monfrey agreed either orally or in writing that the payments were in consideration of Heusinger's promise not to interfere with the business, although such an undertaking might well be inherent in the purported assignment of goodwill and other intangibles. We do not doubt that Monfrey hoped and expected that this would be a result accomplished by the payment, but there was evidently no meeting of the minds of the two parties to this effect. Rather, it appears that Monfrey acceded to Heusinger's demand for a payment for some intangible asset which Heusinger claimed he possessed.

But even if it were assumed that the payments in question were to obtain a peaceable transition and to prevent Heusinger from competing or interfering with the market, we think they would not be deductible as ordinary and necessary business expenses. Not all necessary expenditures are deductible as ordinary and necessary business expenses. In *Welch* v. *Helvering*, 290 U.S. 111, cited by both parties, the Supreme Court held that certain payments made by the taxpayer in satisfaction of claims of former customers of a bankrupt corporation of which the taxpayer had been an officer, in order to strengthen his individual standing and credit and to reestablish business relations with such former customers, did not constitute ordinary and necessary business expenses. The Court sustained the respondent's determina-

---

[1] See *Lyeth* v. *Hoey*, 305 U.S. 188, *Raytheon Production Corporation* v. *Commissioner*, (C.A. 1) 144 F. 2d 110, and *Estate of Mabel K. Carter*, 35 T.C. 326, which hold that the character of an amount received in settlement of litigation depends upon the nature of the claim which is settled.

tion that the payments in controversy came closer to capital outlays than to ordinary and necessary expenses in the operation of the taxpayer's business, pointing out that many necessary payments are charges upon capital. There are several cases in which it has been held that expenditures made to retain, protect, or promote an established business are deductible as ordinary and necessary business expenses. See *Cubbedge Snow*, 31 T.C. 585, and cases cited therein. However, others hold that where expenditures are made in connection with the establishment or acquisition of a new enterprise, they do not constitute ordinary and necessary business expenses. *Welch* v. *Helvering, supra; McDonald* v. *Commissioner*, 323 U.S. 57; and *Carl Reimers Co.*, 19 T.C. 1235, affd. (C.A. 2) 211 F. 2d 66. It has also been held that amounts paid, such as amounts paid for eliminating competition, constitute cost of an intangible capital asset rather than deductible business expenses, and that where the benefits to be derived are permanent or of indefinite duration, no deduction for exhaustion thereof is allowable.[2] *B. T. Babbitt, Inc.*, 32 B.T.A. 693; and *Clark Thread Co.*, 28 B.T.A. 1128, affd. (C.A. 3) 100 F. 2d 257, and cases cited therein. In its opinion in the *Clark* case, the Court of Appeals for the Third Circuit stated: "The benefits derived from this right cannot be confined to the year in which it was acquired and, therefore, the cost of acquiring it cannot be charged against income earned in that year." See also *Carl Reimers Co., supra.*

Monfrey agreed to pay the $65,000 in connection with his entering into the business of distributing Falstaff beer. It is apparent that he considered it necessary to make this payment in order to be able to take over without interruption the same distributor business which had been carried on by Heusinger. The payments cannot, we think, be considered as payments in the promotion of an existing business, but rather as investments in the acquisition of a new business. They, like the expenditures involved in *Welch* v. *Helvering, supra*, come closer to capital outlays than to ordinary and necessary expenses in the operation of the taxpayer's business. It should be added that the record does not establish any basis for allowing the deduction of the payments as amortization under sections 23(1) of the Internal Revenue Code of 1939 and 167(a)(1) of the Internal Revenue Code of 1954. Whatever benefits were received under the contract of July 22, 1953, there is no evidence that they were limited to the years in which the payments were made; such benefits may have been permanent or indefinite. For all that appears the payments were made at the rate of

---

[2] Section 23(1) of the Internal Revenue Code of 1939 and section 167(a)(1) of the Internal Revenue Code of 1954, provide for the deduction of a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business.

3 cents per case of beer sold merely for the reason that that was a convenient method of paying the $65,000 which had been agreed to be paid.

In view of the foregoing, the respondent's determinations are approved.

*Decisions will be entered for the respondent.*