530 F.2d 708
 76-1 USTC P 9243
 BILAR TOOL & DIE CORPORATION, formerly Forway Tool & Die
Company, Inc., a Michigan Corporation,
Petitioner-Appellee-Cross-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant-Cross-Appellee.
 Nos. 75--1224, 75--1225.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 17, 1975.
Decided Feb. 18, 1976.
Rehearing Denied March 19, 1976.
 
 Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Elmer J. Kelsey, Robert A. Bernstein, Tax Div., Dept. of Justice, Meade Whitaker, Chief Counsel, I.R.S., Washington, D.C., for C.I.R.
 William L. Powers, Butzel, Long, Gust, Klein & Van Zile, Richard U. Mosher, Detroit, Mich., for Bilar Tool & Die Corp.
 Before EDWARDS and PECK, Circuit Judges, and McALLISTER, Senior Circuit Judge.
 EDWARDS, Circuit Judge.
 
 
 1
 This is a government appeal from a decision by a sharply divided Tax Court which allowed deduction of $4,000 in attorney fees as ordinary and necessary expenses. These fees resulted from legal work on a corporate division which split the Forway Tool & Die Company, Inc., into two equal parts. The taxpayer in this case, Bilar Tool & Die Corporation, as a result of a simple change of name, is the direct successor to the previous corporation. A new corporation was organized under the name of Four-Way Tool & Die, Inc.
 
 
 2
 The parties stipulated that the corporate division described above resulted from a dispute between two shareholders, Markoff an Sakuta, who had previously had equal ownership of the original corporation. They also stipulated that the agreed-on plan called for equal division of the financial and physical assets of the old corporation, as well as equal division of the liabilities. As a result, Markoff would own 100% of the stock of Bilar, and Sakuta 100% of the stock of the newly organized company, Four-Way. The plan contemplated what actually occurred, namely, that two corporations would continue in the same business in which the old corporation was engaged--but after the split, as competitors. The stipulation stated 'the series of events evidenced by the above stipulated facts and joint exhibits constitute a single unified plan.'
 
 
 3
 The stipulation also indicated that Bilar Tool & Die incurred legal and accounting fees in the sum of $11,500 'in connection with the plan.' Taxpayer, however, did not see fit to introduce any specific evidence concerning those services, except as to the $4,000 of attorney fees. As to this an attorney testified that the $4,000 was a fee paid for devising and carrying out the unified plan referred to above. He also testified that $400 of the $4,000 was directly attributable to expenses involved in the incorporation of the new corporation.
 
 
 4
 The majority of the Tax Court found that the $4,000 was an ordinary and necessary business expense under IRC § 162(a), 26 U.S.C. § 162(a) (1970). The Tax Court declined to allow deductibility as to the remaining $7,500 because of failure to prove that the expenses were ordinary and necessary. As to this issue, the taxpayer appeals.
 
 
 5
 The majority of the Tax Court found that the dominant aspect of the overall plan was a division of the business through a partial liquidation. It allowed deduction of the $4,000 of attorney fees as ordinary and necessary expenses under § 162(a) of the Code. In so doing it cited and relied on United States v. General Bancshares Corp., 388 F.2d 184 (8th Cir. 1968), and Transamerica Corp. v. United States, 254 F.Supp. 504 (N.D.Cal.1966), aff'd, 392 F.2d 522 (9th Cir. 1968). The appellee adopts the Tax Court's view and urges us to do likewise.
 
 
 6
 On the other hand, the government contends that there was no liquidation at all, that this was simply a corporate reorganization where all the assets of the corporation were continued in business, albeit in divided form. Under this theory the expenses of reorganization are capital expenditures and nondeductible under IRC § 263(a)(1), 26 U.S.C. § 263(a)(1) (1970).
 
 
 7
 The government also contends that the tax problem should be looked at from the point of view of the transaction taken as a whole and should not be viewed, as the majority of the Tax Court did, from the point of view solely of the Bilar half of the former corporation, which is the taxpayer here. In the government's view Bancshares and Transamerica were wrongly decided.
 
 
 8
 The majority opinion of the Tax Court found as a matter of fact that '(p) etitioner acquired nothing (through the total plan) that would be of any benefit to it in its future operations.' The Tax Court also found '(s)o far as the corporate petitioner is concerned, there was no improvement or betterment of any capital asset it owned.' We believe these findings are 'clearly erroneous.' (See Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)) and that the decision of the Tax Court must be reversed.
 
 
 9
 The reasons for 'the Plan of Reorganization' are set forth in the minutes of the meeting which adopted it:
 
 
 10
 4. On September 21, 1967, a special meeting of the Board of Directors of the Corporation was held and the following resolutions were made:
 
 
 11
 (a) That a disagreement had arisen in 1967 between the two shareholders of the Corporation which made it impossible for the Corporation to continue operations in its present corporate form,
 
 
 12
 (b) That the shareholders of the Corporation had agreed upon a division of the business whereby the assets of the Corporation would be divided and whereby approximately one-half (1/2) of the Corporation's total assets would be owned in a separate corporate form by Mr. Sakuta and the remaining assets would continue to be held by the Corporation which would be wholly owned by Mr. Markoff, and
 
 
 13
 (c) That a plan of corporate separation should be adopted.
 
 
 14
 The testimony of the president of the present taxpayer corporation vividly demonstrates just how important to the owners' investment in the old corporation the corporate reorganization plan for its division into two corporations actually was. At the Tax Court hearing Mr. Markoff testified:
 
 
 15
 MR. MOSHER: . . . Mr. Markoff, I direct your attention to Joint Exhibit 2--B, page 2, the third paragraph of that page. The third paragraph of that page indicates that there was a disagreement between you and Mr. Sakuta. Can you tell me what the nature of that disagreement was?
 
 
 16
 A Yes, it was a disagreement about the working situation there at that time. The president of the corporation at that time, Joseph Sakuta and the foreman, had a big argument and it was either Joe Sakuta leaving the corporation or the foreman, Larry Caloia.
 
 
 17
 Q Was Mr. Sakuta's son employed by the corporation at that time?
 
 
 18
 A Yes, he was working for the corporation at that time.
 
 
 19
 Q Was he an officer of the corporation?
 
 
 20
 A No.
 
 
 21
 Q Was there some dispute as to the amount of responsibility which Mr. Sakuta's son should have?
 
 
 22
 A This was one of the big arguments of the corporation. It wasn't Joe Sakuta personally, but his wife and it got back to the corporation and it was always a turmoil there that the son should have more authority in the business, more responsibility and I would rather have, like I say, the fellow that I could depend on, Larry Caloia working in that category than his son Joey.
 
 
 23
 Q Are you saying that you could not depend on Mr. Sakuta's son?
 
 
 24
 A I would say he was inexperienced, right.
 
 
 25
 Q I would also direct your attention to the second half of the third paragraph on page 2 of the agreement. It says that the disagreement made it impossible--excuse me, the disagreement made impossible the continued operation of the tool and die business in its present corporate form. Can you tell me what is meant by impossible in that context?
 
 
 26
 A Well, as I mentioned before, Larry Caloia was our foreman at that time and he ran the business when I was out getting new business. When I left the plant, Joe Sakuta and his son would get together in the office and just spend most of their time in the office instead of watching how the corporation was running--how the business was running. When it got to a point where it was either Joe Sakuta or Larry Caloia, I had to have somebody there that I could depend on, that when I left the plant, that the plant would be running right.
 
 
 27
 Q Can you tell me what, in your mind, would have happened to the corporation if some agreement or some separation did not occur?
 
 
 28
 A We would have had a real rough road to go and I think eventually would have went down the drain, as the way it was going there.
 
 
 29
 When a plan of reorganization of a corporation which is going 'down the drain' produces two viable corporations by the equal division of the assets of the doomed (or threatened) corporation, we believe value has clearly been added to the capital structure of both the original corporation and the successor corporations. Such was the dominant purpose and result of the reorganization plan as this record clearly establishes. Under these facts the expenses of carrying out such a reorganization plan are nondeductible capital outlays. As stated in Mills Estate v. Commissioner, 206 F.2d 244, 246 (2d Cir. 1953):
 
 
 30
 The part played in respect to the operation of the business is what counts in determining whether the necessary expense of obtaining it was an ordinary business expense which is deductible under section 23(a)(1)(A) of the Code. As was said in Case v. Commissioner, 9 Cir., 103 F.2d 283, 286, 'For income tax purposes, the entire proceeding must be viewed as a single transaction. Substance and not form controls in applying a tax statute.'
 
 
 31
 This taxpayer, having decided to go out of the real estate operation part of its business and having turned its real estate into cash, underwent a recapitalization to give itself the capital structure it determined was best suited to carrying on that part of the business it was to continue. The services for which the attorneys were paid were all necessary steps to attain that end. What occurred was essentially a reorganization--a change in the corporate structure for the benefit of future operations--and the expenses of that sort of a corporate change are not deductible as ordinary and necessary expenses in carrying on a trade or business. Skenandoa Rayon Corp. v. Commissioner, 2 Cir., 122 F.2d 268, certiorari denied, 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556; Motion Picture Capital Corp. v. Commissioner, 2 Cir., 80 F.2d 872; Baltimore & O.R. Co. v. Commissioner, 4 Cir., 78 F.2d 460; Missouri-Kansas Pipe Line Co. v. Commissioner, 3 Cir., 148 F.2d 460. They are instead a part of the expenditure needed to give the corporation an intangible asset which we may call its altered corporate structure; and, as were the costs of its original organization, these expenditures were capital in nature.
 
 
 32
 Appellee taxpayer in this case relies principally, as did the Tax Court, on two bank cases, United States v. General Bancshares Corp., 388 F.2d 184 (8th Cir. 1968), and Transamerica Corp. v. United States, 254 F.Supp. 504 (N.D.Cal.1966), aff'd, 392 F.2d 522 (9th Cir. 1968). In these cases the banks concerned were required by the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841--49 (1970), to divest themselves of either their banking or nonbanking assets, and the courts concerned found no benefit to the taxpayers from the divestiture thus compelled. Such compelled divestiture of assets with no consequent enhancement of capital assets does not seem comparable to our instant facts.
 
 
 33
 Gravois Planing Mill Co. v. Commissioner, 299 F.2d 199 (8th Cir. 1962) is relied upon by the Tax Court majority and by the appellee in this case. Gravois, however, presented a quite different set of facts than those we deal with here. In Gravois the company's longtime president and 50% stockholder retired at the age of 67. This resulted in the company's purchase of the great majority of his stock by payment of all the cash the company could afford, transfer to the retiree (Beckemeier) of a corporation-owned insurance policy on his life, and the transfer to him of physical assets previously owned by the company. The latter (which included the plant) were then leased back to the company at a rental agreed upon for 10 years. The net result was that the three younger stockholders continued in business with greatly reduced capital assets. On these facts Justice Blackmun held for the Eighth Circuit in distinguishing Mills Estate, supra, 'the dominant aspect of the Gravois transaction was the liquidation of the Beckemeier shares and not the recapitalization.' Gravois Planing Mill Co. v. Commissioner, supra at 209. He also emphasized that 'the basic problem with which they struggled was that of the disposition of the outstanding Beckemeier stock and was not one directed to change or any desired improvement in the form of the corporate structure.' Id. capital is involved in our instant case capitl is involved in our instant case and there is both beneficial change and improvement shown in the instant plan. Additionally, although of less significance, it is interesting to note that the parties in Gravois referred to their plan as 'liquidation' of the Beckemeier stock interest, whereas the parties in our present case termed their plan (accurately, we think) 'Plan for Reorganization.'
 
 
 34
 The plan we deal with must be looked at from the point of view of its totality. So regarded it is a typical reorganization, and as noted above, the minutes of both the Board of Directors' meeting and the Stockholders' meeting of the old corporation which adopted the unified plan characterized it as 'The Plan of Reorganization.' We are not able to find in the facts of this case any liquidation at all--partial or otherwise. This plan clearly fits the Reorganization definitions of Section 368, which provide:
 
 
 35
 (a) Reorganization.--
 
 
 36
 (1) In general.--For purposes of parts I and II and this part, the term 'reorganization' means--
 
 
 37
 (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;
 
 26 U.S.C. § 368(a)(1)(D) (1970)
 
 38
 We recognize, of course, that this section does not pertain to corporation deductions, but we believe its definition is helpful nonetheless.
 
 The controlling section is § 162:
 
 39
 SEC. 162. Trade Or Business Expenses.
 
 
 40
 (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *
 
 
 41
 26 U.S.C. § 162(a) (1970).
 
 
 42
 The attorney fees were expenditures for devising and carrying out the 'unified plan.' They were not 'incurred . . . in carrying on any trade or business.' They were not 'ordinary or necessary expenses.' They were of benefit to the whole of the original corporation because they served the purpose of terminating the dissension which threatened to wreck it. They were likewise of capital benefit to both successor corporations, since they were essential to making both possible. The $400 portion which was expended on incorporation of the new company is properly to be regarded as an expenditure for carrying out the total plan.
 
 
 43
 Thus, as we see the matter, the entire $4,000 was an expenditure to enhance capital which was calculated to benefit the taxpayer for much more than one year. In Richmond Television Corp. v. United States, the Fourth Circuit said:
 
 
 44
 Our system of income taxation attempts to match income and expenses of the taxable year so as to tax only net income. A taxpayer may, therefore, not deduct as a current business expense the full cost of acquiring an asset, tangible or intangible, which benefits the taxpayer for more than one year. The concept has been explained in United States v. Akin, 248 F.2d 742, 744 (10th Cir. 1957).
 
 
 45
 '(A)n expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year, or if it secures a like advantage to the taxpayer which has a life of more than one year.'
 
 
 46
 Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965). (Footnote omitted.)
 
 
 47
 On the basis of what has been said above, it goes without saying that we find no merit to taxpayers' appeal contending that the Tax Court should have allowed an additional $7,500 in deductions of expenses in connection with carrying out the corporate reorganization plan.
 
 
 48
 The decision of the Tax Court is reversed and the case is remanded for recomputation of the tax, with the entire $11,500 of claimed deductions disallowed.