NATIONAL STARCH AND CHEMICAL CORP., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31669-84.          Filed July 24, 1989.

*Richard J. Hiegel, Leonard E. Kust, Richard H. Walker,* and *Geoffrey R.S. Brown,* for the petitioner.
*Richard J. Sapinski, Daniel Morman, Paul J. Sude,* and *Janet A. Engel,* for the respondent.

CLAPP, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended August 15, 1978, in the amount of $1,068,281. The only

issue for our decision is whether petitioner, the acquired corporation in a friendly takeover, may deduct under section 162(a)[1] the expenditures it incurred incident to the takeover.

FINDINGS OF FACT

Most of the facts were stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, the principal office of National Starch & Chemical Corp. (petitioner) was located in Bridgewater, New Jersey.

Petitioner is a Delaware corporation which uses the accrual method of accounting for Federal income tax purposes. The tax year in issue was a short year that ran from January 1 to August 15, 1978. Petitioner manufactures and sells adhesives, starches, and specialty chemical products in the United States and certain foreign countries. Immediately prior to August 15, 1978, petitioner's authorized capital stock consisted of 250,000 shares of preferred stock, none issued or outstanding, and 8 million shares of common stock, approximately 6,563,930 shares of which were issued and outstanding. Petitioner's common stock was publicly held by approximately 3,700 shareholders and was traded on the New York Stock Exchange. Petitioner's largest shareholder was Frank K. Greenwall (Greenwall) who, together with his wife, owned approximately 14½ percent of petitioner's outstanding common stock.

Unilever United States, Inc. (Unilever U.S.), is a Delaware corporation whose principal office is located in New York City. It is a holding company whose principal subsidiaries prior to August 15, 1978, were Lever Brothers Co. and Thomas J. Lipton, Inc. These corporations manufacture and sell foods, detergents, and other products. All of the outstanding stock of Unilever U.S. is owned by Unilever N.V., a publicly held Netherlands corporation. Unilever N.V. and Unilever PLC (a publicly held United Kingdom corporation), along with companies directly or indirectly owned or controlled by them, comprise the Unilever Group.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

On October 7, 1977, representatives of the Unilever Group indicated an interest in making a tender offer for all of petitioner's stock. This interest was expressed at a meeting with the chairman of petitioner's board of directors and with Greenwall (who was chairman of the executive committee of the board of directors). In the course of the subsequent discussions, Greenwall (who was 81 years old and his wife 79 years old) indicated that for estate planning reasons he and his wife would voluntarily dispose of their stock only in a tax-free transaction that would be available to the other shareholders. The Unilever Group said that it would proceed with the tender offer only if both Greenwall and petitioner favored the acquisition of the stock.

The law firm of Cravath, Swaine & Moore, counsel to Unilever U.S., and Debevoise, Plimpton, Lyons & Gates (Debevoise, Plimpton), counsel to petitioner and to the Greenwalls, devised a structure that was designed to satisfy Greenwall's concerns. This structure involved the formation of two new companies. One was National Starch & Chemical Holding Corp. (Holding), a Delaware subsidiary of Unilever U.S. The other, which would have only a transitory existence, was a subsidiary of Holding named NSC Merger, Inc. Pursuant to an exchange offer, Holding would exchange one share of its nonvoting preferred stock for each share of petitioner's common stock that it received from petitioner's shareholders. This transaction was intended to be tax free under section 351. Pursuant to an Agreement and Plan of Merger (merger agreement), any common stock of petitioner that was not acquired by Holding pursuant to the exchange offer would be converted into cash in a merger of NSC Merger, Inc. into petitioner. The structure of the proposed transaction was discussed with Internal Revenue Service officials in the ruling branch of the national office on November 3, 1977.

On November 7, 1977, petitioner's directors were told about the Unilever Group's interest in purchasing petitioner's stock and about the proposed structure of the transaction. At that meeting, Edward A. Perell, a partner at Debevoise, Plimpton, advised the directors that they had a fiduciary duty under Delaware law to ensure that the proposed transaction would be fair to the stockholders. In

his judgment, the directors should retain an outside independent investment banking firm which would assist in the valuation of petitioner and would be available in the event that either the Unilever Group or a third party made a hostile or unsolicited tender offer. Perell told the directors that their failure to retain such a firm might be evidence that they did not carry out their fiduciary responsibilities.

On November 14, 1977, petitioner engaged the investment banking firm of Morgan Stanley & Co. Inc. (Morgan Stanley). Morgan Stanley was retained primarily to value the stock, to render a fairness opinion, and to stand ready to assist if there was a hostile tender offer.

The Unilever Group had originally proposed a price of $65 to $70 for each share of stock in petitioner and, after valuing petitioner, Morgan Stanley informed petitioner that such a price was fair. Subsequently, Morgan Stanley held discussions with the Unilever Group's representative and was offered a price of $70. The senior executives of petitioner felt that this price was too low and told the Morgan Stanley representative that they wanted $80. Morgan Stanley conveyed this information to the Unilever Group's representative and several days later Morgan Stanley reported that the Unilever Group had offered $73.50.

On December 11, 1977, a representative of Morgan Stanley submitted to petitioner's board of directors an oral report favorably evaluating the offer. On that same date, a letter of intent relating to the acquisition of petitioner's common stock was executed by petitioner and Unilever U.S.

On March 16, 1978, the board approved the execution of the merger agreement. Under the terms of that agreement, petitioner did not have to proceed with the transaction unless the Internal Revenue Service issued a favorable private letter ruling. Such a ruling letter was issued on June 28, 1978. This ruling letter held that the formation of Holding's subsidiary, NSC Merger, Inc., and the merger of that subsidiary into petitioner (a reverse subsidiary cash merger) would be disregarded for Federal tax purposes. The transaction would be a taxable sale to those shareholders who received cash and would be tax free under section 351 to shareholders who received Holding preferred stock. When

the Internal Revenue Service issued the ruling letter, it did not know that petitioner would claim a deduction for its legal fees and for its Morgan Stanley fee.

On July 10, 1978, Morgan Stanley's written fairness opinion was delivered to the board. This opinion concluded that the terms of the proposed merger agreement and related exchange offer taken as a whole were fair and equitable to petitioner's shareholders from a financial point of view.

On August 15, 1978, a special meeting of petitioner's shareholders was held at which the merger agreement was approved. Later the same day, there was a closing of both parts of the transaction pursuant to the exchange offer and the merger agreement. In the transaction, 179 of petitioner's shareholders (holding approximately 21 percent of petitioner's common stock) voluntarily exchanged their stock on a share-for-share basis for 1,313,383 shares of Holding nonvoting preferred stock with a par value of $73.50 per share. The remaining shareholders exchanged their stock for $73.50 per share in cash. As a result of the transaction, Holding acquired all of petitioner's outstanding common stock in exchange for cash of $380,151,075 and Holding preferred stock with an aggregate par value of $96,533,650.

A Morgan Stanley report had said that petitioner's management believed that affiliation with Unilever would create the opportunity for "synergy," and petitioner's 1978 annual report had said that petitioner would benefit from the availability of the Unilever Group's enormous resources. However, petitioner's business continued as before following Holding's acquisition of its stock. Its directors and officers remained in office, and its key officers and employees executed employment contracts with it as required by the merger agreement. The Unilever Group did not make any changes in the operation of petitioner, nor did it provide petitioner with significant technological or financial assistance, nor with significant legal, administrative, or accounting services. Petitioner did not acquire any property or services from any member of the Unilever Group nor did petitioner dispose of any of its assets or property. There was no material increase in petitioner's sales to the Unilever

Group. For purposes of administrative convenience and simplicity, petitioner's Certificate of Incorporation was amended to eliminate its previously authorized shares of preferred stock and to reduce the total number of its authorized shares of common stock to 1,000.

Morgan Stanley charged petitioner a fee of $2,200,000 for its services. This fee was reasonable in amount. Morgan Stanley also charged petitioner a fee of $7,586.23 for out-of-pocket expenses and $18,000 for the legal fees of its counsel. Debevoise, Plimpton charged petitioner $490,000 for the legal services rendered by it to petitioner and its board of directors, plus out-of-pocket expenses of $15,069. The services performed by Debevoise, Plimpton included advice given petitioner and its board of directors regarding their legal rights and obligations with respect to the transaction, preparation of the Internal Revenue Service ruling request, participation in negotiations, and preparation of documents. This fee was reasonable in amount. Petitioner also incurred other expenses totalling $150,962 in connection with the transaction. These expenses were reasonable in amount and were of a type customarily incurred in connection with similar transactions.

In the Federal income tax return for the year ending in 1978, petitioner deducted the Morgan Stanley fee but did not deduct the Debevoise, Plimpton fee or the other expenses. In his notice of deficiency, respondent disallowed the Morgan Stanley fee. In the petition, petitioner contested the deficiency determined by respondent and also claimed overpayment of taxes because the Debevoise, Plimpton fee and other expenses were not deducted.

### OPINION

The only issue for decision is whether petitioner, the acquired firm in a friendly takeover, is entitled to deduct under section 162(a) the expenditures it incurred incident to the takeover. To our surprise, we find that this issue is one of first impression despite the prevalence of takeovers in the modern corporate world; however, we note that two highly respected commentators have stated, without citation of authority, that—

The well-established rule in this area is that amounts incurred to effectuate a corporate "reorganization" (in the broad sense of a rearrangement resulting in a restructuring of the corporate entity or enterprise, even if not a technical "reorganization" as defined by section 368(a) * * * are not currently deductible as business expenses under section 162 by the person incurring such costs. [B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.06.2, p. 5-33 (5th ed. 1987).]

Petitioner argues that it is entitled to take the deductions because the expenditures were ordinary and necessary within the meaning of section 162(a). Respondent argues that the expenditures are nondeductible because they either were capital expenditures or were constructive distributions to the shareholders.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ." Five separate requirements must be satisfied before a deduction is allowed under this section. *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345 (1971). One requirement—that the expenditures be paid or incurred during the taxable year— clearly is satisfied. Respondent claims that none of the other requirements are satisfied. Those requirements are (1) that the expenditures were necessary, (2) that the expenditures were for the carrying on of a trade or business, (3) that the expenditures were ordinary, and (4) that the expenditures were current expenses, not capital expenditures. Given our disposition of the case, we need consider only the last of these requirements.

The distinction between a deductible current expense and a nondeductible capital expenditure can, at times, be unclear. When making the distinction, it must be kept in mind that deductions are a matter of legislative grace. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934). Deduction statutes must be strictly construed. *Mills Estate v. Commissioner,* 206 F.2d 244, 246 (2d Cir. 1953), revg. in part on other grounds 17 T.C. 910 (1951). The taxpayer bears the burden of showing the right to the claimed deduction. *Interstate Transit Lines v. Commissioner,* 319 U.S. 590 (1943). A deduction is not allowed just because an expenditure possesses "some characteristics different from the more commonly accepted capital expenditures * * * ."

*General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 716 (8th Cir. 1964), affg. 39 T.C. 423 (1962), cert. denied 379 U.S. 832 (1964).

The courts have determined that a number of expenditures are capital and, thus, nondeductible. These expenditures include, among others, those incurred incident to a merger into a parent company, *Denver & Salt Lake Railway Co. v. Commissioner,* 24 T.C. 709 (1955), dismissed pursuant to stipulation 234 F.2d 663 (10th Cir. 1956); a distribution to shareholders of subscription warrants for a subsidiary's stock, *Missouri-Kansas Pipe Line Co. v. Commissioner,* 148 F.2d 460 (3d Cir. 1945), affg. a Memorandum Opinion of this Court; a distribution of stock dividends, *General Bancshares Corp. v. Commissioner, supra;* a recapitalization, *Mills Estate Inc. v. Commissioner, supra;* a corporate reorganization, *Gravois Planing Mill Co. v. Commissioner,* 299 F.2d 199, 206 (8th Cir. 1962), revg. on other grounds a Memorandum Opinion of this Court; a bankruptcy reorganization, *Bush Terminal Buildings Co. v. Commissioner,* 7 T.C. 793, 818-819 (1946); and an increase in capitalization, *Fishing Tackle Products Co. v. Commissioner,* 27 T.C. 638, 645 (1957).

Relying on cases such as these, respondent argues that petitioner's expenditures are nondeductible because they were incurred incident to a recapitalization, merger, or reorganization. As evidence of a recapitalization, respondent points to the amendment of petitioner's Certificate of Incorporation that eliminated the previously authorized shares of preferred stock and reduced the total number of authorized shares of common stock to 1,000. We note, however, that this amendment was done merely for purposes of administrative convenience and simplicity. Accordingly, it is not relevant to the deductibility issue.

As evidence of a merger, respondent points to the merger of NSC Merger, Inc. into petitioner. This merger, however, was incidental to the transaction, as illustrated by the Internal Revenue Service ruling letter which stated that the merger would be disregarded. Accordingly, the merger will not cause the expenditures to be characterized as capital expenditures.

Finally, respondent argues that from the standpoint of the corporation the transaction was essentially a reorganization under section 368(a)(1)(B). Respondent acknowledges that from the standpoint of the shareholders the transaction differed significantly from a section 368(a)(1)(B) reorganization, but argues that this is unimportant since we are focusing on the tax consequences to the corporation. We agree that the various definitions of section 368(a)(1) can be helpful when deciding whether from the corporate viewpoint an expenditure was incurred incident to a reorganization. *Bilar Tool & Die Corp. v. Commissioner,* 530 F.2d 708, 713 (6th Cir. 1976), revg. on factual grounds 62 T.C. 213 (1974). We are unwilling to hold, however, that the instant transaction is sufficiently similar to a reorganization under section 368(a)(1)(B) to cause the expenditures to be capital in nature.

Although we reject these specific arguments, we hold that the expenditures at issue are not deductible under section 162(a). We base our holding upon our judgment that petitioner's directors determined that it would be in petitioner's long-term interest to shift ownership of the corporate stock to Unilever. The expenditures in issue were incurred incident to that shift in ownership and, accordingly, lead to a benefit "which could be expected to produce returns for many years in the future." *E.I. duPont de Nemours & Co. v. United States,* 432 F.2d 1052, 1059 (3d Cir. 1970). An expenditure which results in such a benefit is capital in nature. *E.I. duPont de Nemours & Co. v. United States, supra* at 1059; *Falstaff Beer, Inc. v. Commissioner,* 322 F.2d 744, 745-746 (5th Cir. 1963), affg. 37 T.C. 451 (1961); *Clark Thread Co. v. Commissioner,* 100 F.2d 257, 258 (3d Cir. 1938), affg. 28 B.T.A. 1128 (1933); *McDonald v. Commissioner,* 139 F.2d 400, 401 (3d Cir. 1943), affd. 323 U.S. 57 (1944). The reason for the capitalization of such expenditures is "that the purpose for which the expenditure is made has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year, in contrast to being devoted to the income production or other needs of the more immediate present." *General*

*Bancshares Corp. v. Commissioner, supra* at 715. "While the period of the benefits may not be controlling in all cases, it nonetheless remains a prominent, if not predominate, characteristic of a capital item." *Central Texas Savings & Loan Association v. United States,* 731 F.2d 1181, 1183 (5th Cir. 1984). Expenditures may be capital in nature even if they do not result in the acquisition or increase of a corporate asset. *General Bancshares v. Commissioner, supra* at 716. If no capital asset is acquired, it does not follow that an expenditure is deductible. *Baltimore & Ohio Railroad Co. v. Commissioner,* 29 B.T.A. 368, 372-373 (1933), affd. 78 F.2d 460 (4th Cir. 1935); *Holeproof Hosiery Co. v. Commissioner,* 11 B.T.A. 547, 556 (1928).

Our judgment that petitioner's directors determined that it would be in petitioner's long-term interest to shift ownership of the corporate stock to Unilever is based upon several factors. First, "when a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interest of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Corp.,* 493 A.2d 946, 954 (Del. 1985). Because petitioner's directors approved the takeover, they must have determined that it was in the best interest of petitioner and its shareholders. Second, petitioner's 1978 annual report said that petitioner would benefit from the availability of the Unilever Group's enormous resources, and Morgan Stanley said that petitioner's affiliation with Unilever would create the opportunity for "synergy." There is no evidence of an immediate benefit from the affiliation, but we believe that this is immaterial. The lack of benefits in the short term does not imply their absence in the long term, especially given the time it takes to plan and implement significant changes in a corporation's operations. Besides, expenditures "made with the contemplation that they will result in the creation of a capital asset cannot be deducted as ordinary and necessary business expenses even though that expectation is subsequently frustrated or defeated * * * ." *Union Mut. Life Ins. Co. v. United States,* 570 F.2d 382, 392 (1st Cir. 1978), cert. denied 439 U.S. 821 (1978); *Radio Station WBIR, Inc. v. Commissioner,* 31 T.C. 803, 813-814 (1959). Third, the very availability of the resources of Unilever was an immediate, as well

as a long-term, benefit because it broadened petitioner's opportunities.

Petitioner argues for several reasons, however, that the expenditures in issue are deductible. First, it cites *Commissioner v. Lincoln Savings and Loan Association, supra* at 354, where it was said that "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year. What is important and controlling, we feel, is that the * * * payment serves to create or enhance for [the taxpayer] what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature * * * ." Petitioner accordingly argues that its expenditures are deductible because the expenditures did not create or enhance a separate and distinct additional asset. In *Lincoln Savings,* however, the Court did not address the deductibility of expenditures which do not create or enhance a separate and distinct asset. Thus, *Lincoln Savings* does not support petitioner's argument.

Petitioner next refers to several Court of Appeals cases that have cited *Lincoln Savings: Iowa-Des Moines Nat. Bank v. Commissioner,* 592 F.2d 433 (8th Cir. 1979), affg. 68 T.C. 872 (1977); *NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir. 1982); *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974); and *Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775 (2d Cir. 1973). *Iowa-Des Moines Nat. Bank* merely cites *Lincoln Savings* for the proposition that a benefit with a future aspect is not controlling. The remaining cases each dealt with the narrow factual situation where a firm increased its business by, respectively, expanding a branch banking system, participating in a credit card system, and soliciting agents for the sale of candies. The court in each case held that the expenditures were ordinary and necessary expenses of doing daily business rather than capital expenditures. Each case depended on its facts, and we do not find them controlling here.

Petitioner also refers to several cases in which the "dominant aspect" of a transaction determined the deductibility of expenditures incurred incident to the transaction.

These cases involved transactions with some of the characteristics of a partial liquidation and some of the characteristics of a reorganization, merger, or recapitalization. In the cases in which the partial liquidation was the "dominant aspect" of the transaction, the expenditures were held to be deductible current expenses. *Gravois Planing Mill Co. v. Commissioner*, 299 F.2d 199, 209 (8th Cir. 1962), revg. a Memorandum Opinion of this Court; *United States v. General Bancshares Corp.*, 388 F.2d 184 (8th Cir. 1968); *United States v. Transamerica Corp.*, 392 F.2d 522 (9th Cir. 1968); and *El Paso Co. v. United States*, 694 F.2d 703 (Fed. Cir. 1982). In the cases in which the reorganization, merger, or recapitalization was the "dominant aspect," the expenditures were capital expenditures. *Mills Estate Inc. v. Commissioner*, 206 F.2d 244 (2d Cir. 1953), revg. in part on other grounds 17 T.C. 910 (1951). In one case, this Court determined that the dominant aspect was a partial liquidation and, thus, the expenditure was a deductible current expense, but the Court of Appeals held that the dominant aspect was a reorganization and, thus, the expenditure was a capital expenditure. *Bilar Tool & Die Corp. v. Commissioner*, 62 T.C. 213 (1974), revd. on factual grounds 530 F.2d 708 (6th Cir. 1976).

Petitioner argues that the dominant aspect of its expenditures was the fiduciary duty its directors owed to its shareholders and, accordingly, that its expenditures are deductible because they were incurred incident to that fiduciary duty. The dominant aspect of the transaction was not the fiduciary duty. Instead, the dominant aspect was the transfer of petitioner's stock for the benefit of petitioner and its shareholders. We would let the tail wag the dog if we were to view the stock transfer as the incidental aspect and the fiduciary duty that arose from the stock transfer as the dominant aspect.

We conclude that the expenditures in issue were related more to petitioner's permanent betterment, and hence capital in nature, than to the carrying on of daily business and production of income. Thus they were not ordinary and necessary within the meaning of section 162(a) and, accordingly, they are not deductible. We need not reach respon-

dent's alternative argument that petitioner's expenditures were constructive distributions to its shareholders.

*Decision will be entered for the respondent.*

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.