UNITED STATES of America, Plaintiff,

v.

Allen F. CAMPBELL and A.F.
Campbell & Co., Inc.,
Defendants.

Civ. A. No. CA 3–85–1716–G.

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 19, 1988.

As Amended Oct. 18, 1988.

---

James E. Carroll, John A. DiCicco, Tracy L. Allen, Trial Attys., Office of Sp. Litiga-

tion, Tax Div., Dept. of Justice, Washington, D.C., for plaintiff.

John A. Price, Thomas R. Helfand, Scott W. O'Brien, Jack R. Endres, Winstead McGuire Sechrest & Minick, G. Thomas Rhodus, Brice & Mankoff, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

FISH, District Judge.

### Introduction

This case was tried before the undersigned, sitting without a jury, for fifteen days in October, 1987 and three days in February, 1988. Some of the material facts were either stipulated or not in substantial dispute. To the extent that the facts were in dispute, however, the findings below are those supported by a preponderance of the credible evidence or, where so required, by clear and convincing evidence.

### Findings of Fact

1. The defendant Allen F. Campbell ("Campbell") is an individual residing within the Northern District of Texas.

2. Campbell, who holds a law degree from the Columbia University Law School and a Masters in Business Administration from the University of Chicago, is the founder and sole shareholder of the defendant A.F. Campbell & Co., Inc. ("Campbell & Co."), a Texas corporation.

3. Prior to forming Campbell & Co., Campbell had worked in a variety of positions: as an attorney for a law firm in Cincinnati, Ohio; as an independent consultant providing consulting services to clients such as Arthur D. Little, Inc.; as an employee of the brokerage firm of Bear Stearns; and as an employee of the brokerage firm of Schneider, Bernet & Hickman in Dallas.

4. Both defendants have been involved in the organization and/or sale of interests in tax shelters since at least 1980, when they began selling interests in a tax shelter known as First Western Government Securities.[1]

---

1. *See Freytag v. Commissioner,* 89 T.C. 849 (1987).

5. Sometime in late 1981 or early 1982, Campbell met with Gwynfor R. Williams ("Williams"), who had been involved with Campbell in the First Western Government Securities tax shelter, to discuss the possibility of organizing a company to operate in the area of monoclonal antibody ("MAB") research. Williams subsequently contacted Fred Stark ("Stark"), who was then a practicing physician in the United States Army, to ask him to join the proposed enterprise.

6. Campbell then caused the formation in Brazil of Coral Sociedade Brasileira de Pesquisase Desenvolvimento Limitada ("Coral"). Campbell did not own Coral's equity in his own name; instead, he caused Coral's equity to be owned by a Netherlands holding company named Inpro Holding Company B.V. ("Inpro") which, in turn, was—and is—owned by Campbell.

7. During this time period, Campbell contacted Ronald M. Mankoff ("Mankoff"), an attorney with the Dallas law firm of Durant and Mankoff, to obtain a legal opinion concerning the tax consequences to potential investors of investing in Coral's proposed research activities.[2]

8. In early 1982, Campbell advised Mankoff of some of the details of the proposed undertaking. Richard C. Vanglish ("Vanglish"), an attorney at Durant & Mankoff, and Bernard Kaye ("Kaye"), executive vice president of Campbell & Co., also participated in those discussions. The transaction was to be designed as a tax shelter to take advantage of the immediate write-off provisions of Section 174 of the Internal Revenue Code of 1954 ("the Code"). Coral, the Brazilian entity, would sell research contracts to investors and agree to manufacture an MAB conjugate selected by the investor. Most of the research was to be performed in England. The research fee was to be payable in two parts, one-eighth in cash and seven-eighths in a promissory note, thereby providing the investor-purchaser with an 8:1 tax write-off.

9. The promissory note, as proposed, was to be payable in a specified number of Brazilian cruzeiros equal in amount to a predetermined United States dollar value. It was to bear interest at 10 percent per annum and was to be without monetary correction or other indexing mechanism.

10. Payments under the proposed note were to commence at the end of the seventh year from its anniversary date at the rate of 25 percent per year until paid off, unless the investor earlier received proceeds from the exploitation of his product. Such proceeds would be used to prepay the obligation.

11. Typically, 20 percent of the $75,000 cash down payment from a Coral research contract was paid out as commissions and an additional 12 percent was paid to Williams as Coral's International Research Coordinator.

12. Campbell advised his lawyers that he had caused Coral to be formed in Brazil, that Coral would maintain a substantial presence in Brazil in connection with Coral's research service contracts, and that the cruzeiro obligation, as described above, which would be used to fund seven-eighths of the research contract, comported with normal commercial practice in Brazil.

13. A cruzeiro note in favor of Coral was transferred to a trust in favor of designated research leaders, such as Williams and Stark. The trust was created in Liechtenstein.

14. In accordance with the proposed transactions, Coral began selling research projects (the "Coral program") in mid–1982. The price of a research contract was set at the cruzeiros equivalent of $600,000, of which $75,000 was paid in cash and the balance financed by a cruzeiros note. The amount of the cruzeiros note equalled $525,000 at the time of the transaction. *See* Findings Number 9 and 10 above.

15. Campbell advised his lawyers that the price Coral was charging investors for research contracts was commercially reasonable.

---

**2.** Mankoff had previously contracted with Campbell to establish a legal defense fund for First Western Government Securities tax shelter.

16. The defendants marketed the Coral program to the general public. In all but a few instances, those contracting with Coral in the United States were partnerships.

17. Through the defendants, Coral contracted with the partnerships to produce a specified MAB conjugate for diagnostic use.

18. Coral retained all rights to the MAB itself, and all rights to utilize the MAB conjugate for therapeutic purposes.

19. An MAB is a laboratory copy of a disease-fighting component found in man and certain animals. Reduced to the simplest explanation, an MAB is developed in a two-step process. First, a potentially toxic substance, known as an antigen, is injected into a laboratory mouse to stimulate the mouse's immune system to produce antibodies to neutralize the antigen. When a sufficient quantity of the antibodies have developed (indicating a good "immune response"), the mouse is killed and the antibody-producing cells (lymphocytes) are removed. These antibody-producing cells alone are not capable of surviving very long outside the body. In the second step, the mouse antibody-producing cells are fused with a type of cancer cell which is capable of growth outside the body. The resulting "hybridoma" cell has properties of both "parents": an antibody that is specific to a particular antigen and that has the ability to reproduce itself outside the body. Because "hybridomas" are formed as a single cell clone arising from the fusion of the two different cells, the antibody produced by the growing and dividing cell is said to be "monoclonal."

20. An MAB conjugate is an MAB linked to an enzyme which permits detection of an antigen by the antibody to be manifested visually by a simple change of color.

21. Coral entered into 202 contracts with United States partnerships from 1982 through 1985. Of the 98 contracts sold in 1982, all but two were entered into after September 4, 1982. 76, 26, and 2 contracts were entered into in 1983, 1984, and 1985, respectively.

22. In offering these contracts to the public, the defendants put on various sales presentations. Some were formal in nature, others informal. Formal presentations included presentations by Certified Financial Planners, accountants, and others wishing to earn a fee for referring a client to Coral. A number of individuals, including Campbell, Stark, and Kaye, spoke about the Coral program at these presentations. Mankoff traveled with Campbell on several occasions and spoke at a number of presentations, both on the tax benefits he claimed would result from investment in the program and on the purported merits of the program itself. He and Vanglish also offered opinions during informal meetings and by telephone when prospective investors contacted them. Mankoff also solicited members of his firm for the names of clients interested in an 8–for–1 research and development tax shelter.

23. During the presentations, Campbell advised those attending that the Coral Program offered an 8–to–1 deduction and a low economic risk—limited to the cash paid —due to the probability of the cruzeiro's continued depreciation against the dollar. Campbell would advise potential investors of what the ever-depreciating cruzeiro rate was, compared to the U.S. dollar deduction an investor in Coral would be entitled to claim, and would offer his opinion that the cruzeiro exchange rate was "heading south." To further substantiate the claim that the Coral program involved low economic risk, a form of addendum to the cruzeiro promissory notes was created, which limited the obligation of each so-called "general partner" to his percentage of equity in the partnership.

24. Campbell stated on one occasion, when questioned about Coral's researchers, that the Coral program was first and foremost a tax shelter and only secondarily a money-making activity. He elaborated that if someone wanted to make big money in MAB research, he should contract with a medical school, paying the full amount of the research contract in cash.

25. Formal presentations of the Coral program were made in Dallas and Houston,

among other places. Mankoff attended some of these meeting with others, including William E. Bailey ("Bailey"), an accountant with the accounting firm of Bailey, Vaught and Robertson.

26. Many informal meetings took place wherein the Coral Program was explained to would-be investors or their representatives. Campbell, Kaye, Mankoff, and Vanglish variously participated in these meetings. Further, the defendants utilized a number of employees and sales representatives.

27. As part of their promotion of the Coral program, defendants and their employees and representatives would distribute to potential investors materials including the following:

   (1) Coral Descriptive Brochure;
   (2) Legal Opinions of Durant and Mankoff (or Brice and Mankoff);
   (3) Booklet entitled "New Client Information" prepared by Bailey, Vaught and Robertson;
   (4) Document entitled "Model Documents"; and
   (5) Cruzeiro history sheet.

28. Both the cruzeiro history sheet and the Bailey, Vaught and Robertson booklet ("the Bailey booklet") depicted the decline of the cruzeiro. The Bailey booklet demonstrated its likely future downward course. No mention was made in the written materials, or otherwise, of the manner in which the $75,000 down payment was to be spent. See Finding Number 11 above.

29. Both the Bailey booklet and the Model Documents book contained sample partnership documents which a number of Coral investors used.

30. Campbell reviewed and approved materials prepared for use in conjunction with the Coral program.

31. Campbell directed the activities of the Coral sales force and Coral's related companies from his office at Campbell & Co.

32. Campbell reviewed and approved the dissemination of promotional materials for the Coral program prepared by salesmen and financial planners which highlighted the devaluating cruzeiro promissory note and the likelihood that it would not be paid at the amount investors claimed as a deduction on their federal income tax returns.

33. In addition to the foregoing materials, defendants or their employees and representatives provided potential investors with a list of available Coral research projects. An interested investor would then select a project and enter into a Coral research contract through the defendants. The defendants recognized the importance of the legal opinion to the successful marketing of the Coral program. They paid not only for its printing but also for the printing and circulation of Mankoff's brief in a case in the Supreme Court of the United States concerning a tax shelter unrelated to Coral.

34. Under the terms of its research and development contracts, Coral was merely obligated to use its best efforts to manufacture a given MAB conjugate. It assumed no responsibility to carry out, nor did it even attempt to undertake, the expensive and difficult task of creating the diagnostic kit that would be necessary to utilize the product commercially.

35. The defendants told investors in the Coral program of the existence of Technology Licensing Company ("TLC"), a company set up to accumulate, from Coral investors, rights to MABs. TLC was to exploit the Coral products assigned to it and remit 4 percent of any amounts it earned (as defined) to the investors.

36. Many of the partnerships which contracted with Coral also contracted with TLC. TLC, originally owned by Inpro, was subsequently acquired by Murex Corporation of Norcross, Georgia ("Murex"). Murex was founded by Campbell, who is its controlling shareholder.

37. Coral did not maintain laboratory facilities anywhere during 1982.

38. During 1982, Coral subcontracted with Sussex University ("Sussex") in Brighton, England, for Sussex to produce 20 monoclonal antibodies. The contract fee was 8,850 pounds sterling per antibody, a

price consistent with estimates Stark gave Campbell in July of 1982, as well as Coral's own cost figures.

39. Six of the MABs to be produced by Sussex were the subject of contracts entered into by Coral with United States investors. Two of these contracts were never performed by Coral/Sussex. Each of these contracts had a stated price of $600,000 and called for down payments of $75,000.

40. To the extent Coral performed research services, it did so in Cambridge, England, although it was not until March of 1983 that work began in the Cambridge laboratory.

41. No MABs were *ever* produced in Coral's facilities in Brazil.

42. No meaningful research activities in relation to the Coral program took place in Brazil, nor did Coral maintain a substantial presence. To the extent any testing was done in Brazil, it was poorly performed and administered; moreover, no such testing was called for by the Coral contract.

43. Williams, Coral's International Research Coordinator, visited Coral's Brazilian facilities no oftener than once a year. C.M.G. Neale, the individual allegedly in charge in Brazil, had no scientific background. To support the appearance of a Brazilian involvement by Coral, his duties consisted primarily of signing documents prepared by others and forwarding them as directed.

44. The research projects which were the subject of the contracts Coral offered to investors were selected by Stark, with some assistance from Williams.

45. The vast majority of the Coral research products lack scientific merit and have little, if any, diagnostic value.

46. Diagnostic tests utilizing Coral MABs would in many cases cause false positive reactions because of the cross-reactive nature between antigens with similar chemical structure.

47. Over 80 Coral projects must, by any definition, be deemed failures because of Coral's inability to conduct any research on the projects (although paid for by investors), its arbitrary termination of projects before recognized scientific practice would dictate such termination, the selection of projects which so lacked scientific merit for diagnostic purposes that failure was all but certain, utilizing assembly line laboratory methodology which was designed more with an eye on marketing the projects to the largest audience than with any scientific principles in mind, and Coral's lack of attention to generally accepted scientific procedures and protocol involved with laboratory research.

48. Murex, Coral's marketing company, was founded in 1984. Murex sells federally-approved clinical diagnostic test kits, known as SUDS kits. Coral's funds and labor were expended to develop the SUDS kits, although the majority of Coral's investors do not share any profits to be derived from those kits. In fact, the kits presently for sale do not even utilize MABs.

49. Murex has purchased MABs principally from sources other than Coral for use in its SUDS diagnostic kits.

50. Murex does offer Coral's MABs for sale as research reagents, but to date total sales of MABs produced by Coral have been insignificant.

51. Defendants sold research contracts to investors in 1984, representing that the contracts qualified for Section 174 research deductions, even though the research on those contracts had been completed before the contract was executed.

52. Coral informed investors that certain contracts were fully performed in 1984, the year the "economic performance" rules became part of the Code. These "economic performance" rules allow deductions to be taken in a year only to the extent research was actually performed during the year.

53. Coral's Liechtenstein trust holds the cruzeiro promissory notes ostensibly as an incentive plan for Coral's researchers. However, it was not an inducement to Stark, Coral's International Scientific Director (who was aware of Brazilian currency depreciation), and realistically could not

be deemed an inducement to anyone, in light of Brazil's history.

54. After consultation with Campbell, Price Waterhouse (on behalf of Coral) informed Inland Revenue, the taxing authority in England, that Coral's MAB research was repetitive and of low value and that the Coral facility was not engaged in high technology or high margin activity.

55. Indexation or monetary correction of obligations is a standard commercial practice in Brazil.

56. The cruzeiro promissory note used by Coral did not comport with normal commercial practice in Brazil.

57. The $600,000 price of the Coral research contracts was not commercially reasonable.

58. The United States investors in the 202 Coral contracts made a total cash down payment to Coral of approximately $18,000,000.

59. A small fraction of the $18,000,000 in cash down payments was actually spent on research. At most, 20 percent—or $3,600,000—was spent on research or research-related activities. Included in those expenditures were substantial sums used to acquire laboratory equipment, which would continue to benefit Coral long after any work was attempted for its United States investors. Also included in the $3,600,000 amount were expenditures applicable to unrelated projects which would benefit only Coral.

60. The bulk of the $18,000,000 in down payments made by investors went to enrich the defendants and Williams. Through Coral's fiscal year ending January 31, 1985, the defendants had received more than $6,500,000, characterized as either commissions, fees, or loans. During that same period, Williams was paid approximately $2,070,000. Collectively, the principals in the Coral program received over twice as much as was expended on research.

61. In addition to commissions paid to the defendants, hundreds of thousands of dollars were paid to Coral salesmen.

62. The prime rate in Brazil during early 1982 was 166.49 percent. Thereafter, interest rates were recorded as the spread above monetary correction, so that in the latter part of 1982 the prime rate was 23.81 percent above monetary correction. It was 24 percent above monetary correction in 1983, 31 percent in 1984, and 24.56 percent above monetary correction as of July of 1985.

63. At the time he was designing the Coral program, Campbell knew of the Brazilian currency's history of precipitous depreciation vis-a-vis the United States dollar and expected its continued depreciation.

64. That expectation was fully realized as the cruzeiro continued to decline at the rate of 289.4 percent in 1983, 223.6 percent in 1984, and 129.7 percent up through August of 1985. As of early 1988, one United States dollar was equivalent to more than 99,000 cruzeiros.

65. At the time he designed the Coral program, Campbell must have known that indexation or monetary correction of obligations was a standard commercial practice in Brazil. He had lived in Brazil and in fact spoke Portugese.

66. This was not Campbell's first involvement in a tax shelter using Brazilian currency. He previously had invested in a general partnership named Trans Petro, which contracted with an Ohio-based research company to develop an oil lubricant. That partnership likewise incurred an "obligation" payable in cruzeiros without monetary correction or any other form of indexing. Campbell's "investment" in Trans Petro resulted in him claiming a tax write-off of in excess of 22-to-1. Campbell's partners in Trans Petro were, among others, Kaye and Bailey, the Coral accountant.

67. Mankoff, an investor in Coral projects who was paid substantial sums both in sales commissions and defense fund legal fees, provided Campbell with a 1982 legal opinion which, among other things, stated:

(a) the [investor] should be entitled to treat the amounts which will be paid or incurred to Coral pursuant to the Agreement as deductible expenses in the year

paid or incurred, under Section 174 of the Code; and

(b) the [investor] should be entitled to include in its deductible expenses under Section 174 of the Code the equivalent sum in United States Dollars of the full amount of the Research Fee which will be payable to Coral pursuant to the Agreement.

68. Mankoff's legal opinion did not include any discussion of the likely tax consequences to an investor at the time he paid off his cruzeiro "obligation." This omission probably resulted from the fact that any mention of negative tax consequences, even those occurring 7–to–10 years later, would make the Coral program less marketable. Indeed, the evidence indicates that Campbell instructed his tax counsel not to highlight the likely gain on payment of the obligation.

69. As stated above, defendants began marketing Coral contracts in 1982. During this time, Campbell had knowledge of at least two tax opinions regarding the Coral program. These written opinions, prepared by tax attorneys, severely critized the conclusions of the Mankoff legal opinion regarding deductibility, its reliance on form over substance, and its failure to recognize that the transaction did not comport with commercial practice. An opinion prepared by Associate Dean Keith Rosenn, University of Miami Law School, an expert on the Brazilian financial system, stated

What I find fascinating is the promissory note itself. I have never seen anyone in the past twenty years take such a note. With an inflation rate of approximately 100% per annum, the present value of an obligation to pay Brazilian cruzeiros ten years from now is practically worthless without monetary correction. *I would have an eyebrow raised about whether the IRS would be gulled by this kind of tax shelter* (emphasis added).

Campbell, an educated business man who had previously marketed tax shelters, nevertheless continued to market Coral.

70. The inference is inescapable that the only reason the Coral obligation was denominated in Brazilian cruzeiros was to take advantage of its almost certain decline. The cruzeiro obligation was utterly devoid of economic substance. Such a note did not comport with commercial practice in Brazil. Due to the absence of a monetary correction index, it could be repaid, if at all, for a small fraction of the amount which defendants claimed could be deducted.

71. The defendants made gross valuation overstatements concerning the Coral program within the meaning of 26 U.S.C. § 6700. They made statements valuing the contracts at $600,000.00, when the true value of the contracts was more nearly equal to the cost of making them—i.e., $5,000 to $15,000, a fact recognized in the Campbell-approved response to Inland Revenue. Expert testimony at trial supports the conclusion that the vast majority of Coral contracts had little or no scientific or commercial value.

72. The failure of Coral's projects to generate any significant revenues confirms the fact that gross valuation overstatements were made by defendant. An aggregate value of $120,000,000 of projects sold to U.S. investors have generated *gross* revenues of less than $5,000, out of which 4 percent will go to investors.

73. The Coral contracts did not result from arm's length bargaining between Coral and the investors. An investor had little incentive to keep the stated sales price down. Under the Coral scheme, a taxpayer in the 50 percent tax bracket, would, if undetected, save $300,000 (one-half of the $600,000 contract price) in federal income taxes, at a cost of a $75,000 down payment and an obligation to pay a lesser sum, perhaps $10,000 to $20,000 (the then dollar equivalent of the cruzeiro obligation), over 3 years beginning 7 years after he saved the $300,000. A rational investor could hardly be expected to balk at this price.

74. The defendants made false and/or fraudulent statements as to material matters. They knew that the correct value of Coral's research projects was far less than the stated value, and they also knew that a comparatively small amount of money would be available to fund these projects after 20 percent of the down payment went

for commissions and an additional 12½ percent went to Williams.

75. Defendants knew, or should have known, that the cruzeiro obligation was a sham which, because it was totally devoid of economic substance, could not be deductible. Defendants knew, or should have known, that the obligation did not comport with normal commercial practice in Brazil. The creation of a Brazilian entity was merely a ruse to justify the use of the sales tool of depreciating currency. Nothing of consequence to the Coral program was done in Brazil. Year after year the defendants were aware of this, yet continued the facade of Coral's activities having their center of gravity in Brazil. The cruzeiro's economic performance—i.e., its persistent decline—was well known to them. The promissory notes assigned to a Liechtenstein trust were purportedly an inducement for Coral's research leaders, although many of them were unaware of the terms of the trust or what economic value, if any, it held for them. In addition, the evidence shows Coral's research leaders were not induced by the trust.

76. Whatever motivational value these notes might have had was reduced even further by Coral's acceptance of the promissory note addendum described in finding number 23 above. Under those addenda, a beneficiary would have to maintain an action against each "general partner" of a Coral partnership for his pro-rata share, rather than suing one general partner for the full amount. Because the value of any given cruzeiro obligation would be very low in the first instance, the cost of maintaining a number of suits against various partners to collect that amount would far outweigh any recovery that might occur.

77. Coral's operations in Brazil were a sham. Despite the fact that Coral sold 98 contracts in 1982 and promised to complete them within 12 months of the contract execution date, Coral had no laboratories at all in that year.

78. The Coral program as organized, marketed, and sold by defendants was first, last, and always a tax shelter involving minimal economic substance. It was designed with the intent to enrich the defendants and Williams. In that respect only, the program was successful.

79. It is clear that each of defendants' false and/or fraudulent statements regarding the value of Coral's research contracts, the deductibility of the economically unreal cruzeiro obligation, the sale of completed projects as research, the commercial practice in Brazil, and the commercial reasonableness of Coral's contract prices, are material matters within the meaning of Section 6700 of the Code. Deductions were dependent upon these statements, and each of them would effect the decision-making process of any reasonable investor.

80. To the extent that any of the foregoing paragraphs should be considered conclusions of law, they are so designated.

*Conclusions of Law*

1. The court has jurisdiction over this action pursuant to Sections 7402 and 7408 of the Code and 28 U.S.C. § 1340.

2. Sections 7408 and 6700 of the Code were enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") to address the phenomenon of abusive tax shelters. *See United States v. Buttorff,* 563 F.Supp. 450, 452 (N.D.Tex. 1983), *aff'd,* 761 F.2d 1056, 1063–1064 (5th Cir.1985).

3. The legislative history of TEFRA reflects the reasons for its enactment. S.Rep. No. 97–494, 97th Cong., 2d Sess. at 266 ([1982] 2 U.S.Code Cong. & Ad.News 781, 1014):

As of September 30, 1981, 248,828 returns with tax shelter issues were in the examination process, according to the 1981 Annual Report of the Commissioner of Internal Revenue. This represents an increase of 74,584 returns of this type over the prior fiscal year. The widespread marketing and use of tax shelters undermines public confidence in the fairness of the tax system and in the effectiveness of existing enforcement provisions. These tax schemes place a disproportionate burden on the Internal Revenue Service resources.

The committee believes that the penalty provisions of present law are ineffective to deal with the growing phenomenon of abusive tax shelters. Abusive tax shelters must be attacked at their source: the organizer and salesman.

The same Report goes on to state the rationale for authorizing injunctive relief in this area (*Id.* at 268 1982 U.S.Code Cong. & Ad.News 1016):

The committee believes that the most effective way in which this new penalty [Section 6700] can be enforced is through injunctions against violators to prevent recurrence of the offense. The ability to seek injunctive relief will insure that the Internal Revenue Service can attack tax shelter schemes years before such challenges would prove possible if the Internal Revenue Service were required to await the filing and examinations of tax returns by investors. *Thus injunctive relief will better enable the Internal Revenue Service to protect the integrity of the tax laws and to protect potentially innocent investors against widespread marketing of such tax schemes* (emphasis added).

Section 7408 was to serve a twofold purpose—to safeguard the treasury and to safeguard innocent investors. *United States v. Lang*, Civil No. CIV-84-3160-W (W.D.Okla. Dec. 11, 1985), slip opinion at 8.

4. Section 7408 authorizes the United States, acting at the request of the Secretary of the Treasury, to institute an action in federal district court, to enjoin any person from further engaging in conduct subject to penalty under Section 6700. A district court has authority to grant such injunctive relief, if it finds—

(1) that the person has engaged in any conduct subject to penalty under section 6700 ..., and

(2) that injunctive relief is appropriate to prevent recurrence of such conduct.

26 U.S.C. § 7408(b).

5. Section 6700, which is captioned "Promoting abusive tax shelters, etc.," in turn provides a penalty for two types of misconduct by those who organize, promote, or sell interests in (or who assist in the organization, promotion or sale of interests in), a partnership or other entity, or an investment plan or arrangement, or any other plan or arrangement: (1) knowingly making or furnishing false or fraudulent statements as to material matters (Section 6700(a)(2)(A)) or (2) making or furnishing gross valuation overstatements (Section 6700(a)(2)(B)). The prohibited statements must be made with respect to the allowability of credits or deductions or other tax benefits by reason of an investor holding an interest in the partnership or other entity, plan or arrangement.

■ 6. The Coral program was based on the deduction for research and experimental expenditures allowed by Section 174 of the Code. That section permits an electing taxpayer to currently deduct from gross income (rather than to amortize) the amount of expenditures "paid or incurred" for research and experimental activities. *See Snow v. Commissioner of Internal Revenue*, 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974). Acquiring a project completed before the date of acquisition would not constitute an expenditure for research and experimentation under Section 174.

■ 7. The United States as plaintiff bears the ultimate burden of persuasion in cases brought under § 6700. *See* 1982 U.S. Code Cong. & Ad.News 1017–1018. The applicable standard of proof is "clear and convincing" evidence. *See Marsellus v. United States*, 544 F.2d 883, 885 (5th Cir. 1977). Therefore, in this suit under § 7408, which incorporates the elements of § 6700, the United States must prove by clear and convincing evidence that the defendants have either (i) knowingly furnished a false statement respecting the availability of any tax benefit or (ii) made a gross valuation overstatement. The evidence in this case establishes that the defendants have organized (or assisted in the organization of), or have participated in the sale of an interest in, Coral MAB research service plans, within the meaning of §§ 6700(a)(1)(A) and 6700(a)(1)(B) of the Code.

8. The defendants have made or furnished, in connection with the organization or sale of Coral MAB research services plans to the partnerships contracting with Coral, statements respecting the allowability of certain deductions under I.R.C. § 174, or with respect to the securing of any other tax benefit provided by chapter 1 of the Code, within the meaning of § 6700(a)(2)(A) of the Code.

9. The defendants have made representations to the investors in the partnerships regarding the value of the contracts with Coral. These statements relate directly to the amount of any deduction allowable under chapter 1 of the Code within the meaning of § 6700(b)(1)(B) of the Code.

▮ 10. Statements of the Coral contract price were statements of value. To offer an object or service at a specified price is to implicitly represent that the object is worth the price. The defendants made numerous statements as to the great value of MABs and furnished rosy sales projections to investors.

11. The defendants were very careful to state during any sales presentation that potential investors should seek their own tax advice. However, the defendants consistently furnished, at no cost, the Mankoff tax opinion indicating what tax benefits could be claimed.

▮ 12. Section 6700(a)(2)(A) requires the United States to prove scienter as to false or fraudulent statements. Before liability can be imposed, a person must have known, or have reason to know, of a statement's falsity or fraudulent nature.

13. Scienter need not be shown to hold a person liable for gross valuation overstatements. Section 6700(b)(1) defines gross valuation overstatement as meaning any statement as to the value of any property or services if (A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and (B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

This 200 percent overvaluation is to be a bright line test. *See United States v. Music Masters, Ltd,* 621 F.Supp. 1046, 1055 (W.D.N.C.1985); *United States v. Turner,* 601 F.Supp. 757, 766–67 (E.D.Wisc.1985), *aff'd,* 787 F.2d 595 (7th Cir.1986).

14. Valuation is necessarily an approximation. Arms length sales are, other things being equal, the best evidence of the value of the assets of a business. *See Gravois Planing Mill Company v. Commissioner of Internal Revenue,* 299 F.2d 199, 211 (8th Cir.1962); *Grill v. United States,* 303 F.2d 922, 926–27, 157 Ct.Cl. 804 (1962); *Music Masters,* above, 621 F.Supp. at 1054. The evidence is overwhelming that the Coral contract prices were not based on arms length transactions, but were created by the defendants for the tax shelter plan. Investors had no incentive to keep the contract price down; on the contrary, their tax savings rose with the contract price.

▮ 15. Courts must look through form to substance. The courts need not give tax effect to the form in which parties cast their transactions if that form does not coincide with economic reality. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. *Commissioner of Internal Revenue v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). *See Diedrich v. Commissioner of Internal Revenue,* 457 U.S. 191, 196, 102 S.Ct. 2414, 2418, 72 L.Ed.2d 777 (1982).

16. Accordingly, transactions that have no economic purpose or substance other than the creation of income tax losses are not infrequently disregarded entirely for tax purposes. *Knetsch v. United States,* 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960); *Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935). For example, courts have disallowed various deductions attributable to notes found not to be genuine debt obligations. *Brannen v. Commissioner of Internal Revenue,* 722 F.2d 695,

701 (11th Cir.1984); *Brountas v. Commissioner of Internal Revenue,* 692 F.2d 152, 156–58 (1st Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Gibson Products Co. v. United States,* 637 F.2d 1041, 1045–52 (5th Cir. 1981); *Fox v. Commissioner,* 80 T.C. 972, 1018–1023 (1983), *aff'd sub nom. Barnard v. Commissioner of Internal Revenue,* 731 F.2d 230, 231–32 (4th Cir.1984).

■ 17. It is not necessary to find that there was in reality no transaction or loan between the parties. Rather, it is only necessary to find that the obligations, as structured, should not be given tax effect according to their form. The court makes that determination here.

■ 18. In determining whether a transaction should be disregarded for tax purposes, the question is not whether the taxpayer had a tax avoidance motive, but "whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory,* above, 293 U.S. at 469, 55 S.Ct. at 267; *Knetsch,* above, 364 U.S. at 365, 81 S.Ct. at 134–35.

19. In this case, the financing vehicle of the Coral program was typically a $525,000 promissory note payable in Brazilian cruzeiros. The notes were not indexed for inflation. Testimony at trial, as well as common sense, support the conclusion that such notes do not comport with normal business practice.

20. A recent tax court case, *Levin v. Commissioner of Internal Revenue,* 87 T.C. 698 (1986), *aff'd,* 832 F.2d 403 (7th Cir.1987), is closely analogous. In *Levin,* the taxpayers were partners in Israeli partnerships formed to develop food packaging machinery systems. The taxpayers sought to exploit the immediate write-off provisions of Code Section 174. One fourth of the development fee was payable immediately. The remainder of the fee was payable, with interest at 10 percent per year through 1982 and 8 percent thereafter, one-half in 1994 and one-half in 1995, unless sooner paid through a fixed percentage of gross revenues from sales of the systems. The periodic payments were to be made in the currency of Israel, but they were not linked to either the Israeli consumer price index or the value of a foreign currency such as the U.S. dollar. Similarly, the interest rate used (10 percent) was not consistent with prevailing rates in Israel, so as to preserve the value of the obligations over time. At the time the transactions were entered into (1979), Israel had a history of sharp currency depreciation (although not nearly that of Brazil's during marketing of the Coral program).

21. In disregarding these obligations for federal tax purposes, the Tax Court first noted:

> At the outset, we observe that the question of the proper tax accounting treatment of a genuine debt stated in a foreign currency, such as the Israeli pound (or shekel) is distinct from the question of whether the obligation itself is a genuine debt. *Only if the debt is found to be genuine does the question of its proper accounting treatment arise* (emphasis added, footnote omitted).

*Levin,* 87 T.C. at 729.

22. The *Levin* court concluded that the obligation there was not "genuine" because it did not comport with normal commercial practice. It first observed that in Israel, "private sector lenders made short-term loans almost exclusively." *Id.* It then noted that most long term loans, made by the Israeli government, did not extend credit on such terms as the partnerships, revealing "that the partnerships' liabilities were unique." *Id.* at 730.

Thereafter the Court concluded

> that the periodic payment liabilities were incurred solely for the tax benefits that they were expected to generate.

*Levin,* 87 T.C. at 732.

In affirming the Tax Court's finding that the shekel obligations were shams, the Seventh Circuit held that the debt stated in shekels would be worthless in the year to be collected. No one would trouble to collect it; and if anyone did, the partners could satisfy it with pocket money.

> The taxpayers' protest—"How could we know that inflation would continue?"—rings hollow. The placement memoranda

for the partnerships predicted inflation; the central bank's prediction at the time the partnerships were formed was for more than 100% inflation in 1980; the market in private loans, reflecting the collective wisdom of private investors, was charging interest of 75% or so. Prices in voluntary transactions incorporate much information, and these prices spoke volumes."

*Levin*, 832 F.2d at 407.

23. For like reasons, this court is convinced that Coral's cruzeiro "obligation" was utterly without economic substance and was utilized solely for the purpose of creating tax benefits.

24. Defendants' false and/or fraudulent statements did not end with making false statements of value and falsely stating that the cruzeiro notes could be deducted for tax purposes. They stated that, in the first instance, Coral's projects could be deducted as research and experimentation expenditures under Section 174 of the Code. That was false. The evidence has shown that Coral did not engage in any real research. It performed routinized, assembly-line projects which did not comport with scientific principles. Projects were sometimes terminated, not for any scientific purpose, but solely for economic ones. Coral was unable to complete almost half of the projects, despite the fact that making the MABs was not particularly difficult.

25. Defendants likewise sold, as research, projects which had already been completed—i.e., "freezer jobs," or projects in which the outcome of the laboratory activities was already known. Coral's own laboratory records show, without contradiction, that in 1984 projects were sold which had already been completed prior to the date of sale. These sales of completed projects resulted from defendants' efforts to cosmetically comply with the changes in the tax law that became effective in 1984, requiring economic performance to take place in the year of deduction.

26. Coral sold, as separate projects, virtually the same product. The only difference was that each project was conjugated with a different enzyme. Bruce Wright, a Coral researcher at the Cambridge laboratory, did not approve of this practice, but it was not his decision. To call these activities "research" demeans the purpose of § 174.

27. Defendants' gross valuation overstatements and false and/or fraudulent statements concerned material matters. "Material," for purposes of § 6700, means any statement which "would have a substantial impact on the decisionmaking process of a reasonably prudent investor." Senate Report No. 97–494, 97th Cong., 2d Sess. at 267 ([1982] 2 U.S.Code Cong. and Ad.News at 1015).

28. The final element for an injunction under § 7408 is a showing that injunctive relief is appropriate to prevent a recurrence of the illegal conduct.

29. When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisite for the remedy has been demonstrated and the injunction would fulfill the legislative purpose. *Donovan v. Brown Equipment and Service Tools, Inc.*, 666 F.2d 148, 157 (5th Cir.1982).

30. In the analogous area of the securities laws, courts have issued injunctions if a reasonable likelihood of repetition of fraudulent conduct exists. Courts have stressed, in applying this standard, that the securities laws were " 'enacted for the purpose of avoiding frauds' [and should be construed] not technically and restrictively, but flexibly to effectuate ... [their] remedial purposes." *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963), *quoting* 3 Sutherland Statutory Construction, 382 *et seq.* (3d ed. 1943). A similar construction is necessary here because, as TEFRA'S legislative history makes abundantly clear, Congress enacted the injunction remedy against abusive tax shelters to combat frauds against the revenues and the public.

31. In determining the likelihood of recurrence of the harmful conduct, and therefore the appropriateness of injunctive re-

lief, courts in the securities area have looked to the past history of the person to be enjoined. Past illegal conduct, even where the past illegal conduct is the particular conduct giving rise to the injunction action before the court, has itself been found to establish a likelihood of recurrence.

32. The character of the defendants' violations compels the conclusion that recurrence is likely. The Coral program was developed with a great degree of coordination and planning. Campbell has made his living since 1980 selling tax shelters. He continues to sell the Coral program in Canada, apparently utilizing essentially the same scheme used in the United States. Yet his own records, if nothing else, have demonstrated the utter lack of value of the Coral program. Less than $20,000 in gross sales (of which investors are only entitled to 4 percent) have been produced in over 5 years. Nothing suggests Campbell will seek his livelihood elsewhere.

33. The court is not pursuaded by defendants' protestations that they will not violate the revenue laws, primarily because new legislation (the Tax Reform Act of 1986) makes it more difficult to market a tax shelter, which is said to be now less valuable to an investor. The sheer complexity and deviousness of defendants' scheme demonstrates a marked ability to manipulate the laws, no matter how much they are changed.

34. Defendants displayed remarkable adroitness in "tailoring" the Coral program to the changes wrought by the 1984 Tax Reform Act. Coral claimed to have somehow "completed" projects relating to contracts signed in 1984, despite the fact most of such contracts were executed in the last quarter of 1984.

35. Defendants and their salesmen advised Coral investors to prepay a portion of the cruzeiro obligation in order to generate "income" on the investor's partnership tax return. The "income" was generated, however, as a result of the gain on the partnership's foreign exchange and not through the sales of any product. This advice was given to investors during the audit of the Coral program and was another deliberate attempt to emphasize form over substance. The record is replete with other evidence of the defendants' manipulation of form over substance.

36. There is no reason to believe, and this court does not, that absent injunction, defendants will conform their conduct to the law, regardless of how often it is changed.

37. The size alone of defendants' scheme demands an injunction. The defendants sold, or caused the sale of, 202 Coral contracts for an aggregate gross sales price of approximately $120,000,000. Defendants led investors to believe that the full contract "price" was deductible. If all investors took such deductions, the defendants are responsible for the taking of $120,000,000 in unallowable tax deductions. Using the 50 percent tax bracket assumption contained in the example in Coral's sales materials, the defendants' scheme, if undetected, would have cost the United States some $60,000,000 in lost revenues.

38. The Internal Revenue Service has been forced to spend countless hours auditing the defendants and the partnerships which invested in their scheme. The cost to, and the strain on, the judicial system of contesting 202 cases in the United States Tax Court, the United States Claims Court, or a federal district court, is likewise incalculable. This harm can be decreased, however, if the defendants are enjoined from representing that any tax benefits based on the Coral program are valid and are ordered to notify the investors that their deductions are not allowable.

39. It is well settled that in a suit for injunctive relief, the voluntary cessation of allegedly illegal conduct does not moot the controversy arising from the challenged activity. *See Allee v. Medrano*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–98, 40 L.Ed.2d 566 (1974); *Donovan v. Cunningham*, 716 F.2d 1455, 1461 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). This is because the defendant is free to return to his old ways. *United States v. W.T. Grant Co.*, 345 U.S.

629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

■ 40. Two important factors in determining the appropriateness of injunctive relief are a defendant's position regarding the legality of the challenged activity and a defendant's occupation of a position from which the challenged activity can be resumed. *Donovan v. Cunningham,* above, 716 F.2d at 1461. Here, defendants continue to insist that the promissory notes are real and meaningful obligations in the research effort, while at the same time their hands grip the controls of a coordinated marketing and manufacturing machine that is idling only until the authorities are out of sight. Injunction in such a situation is the only appropriate response. *See United States v. Buttorff,* above, 761 F.2d at 1062–1063; *United States v. Music Masters,* above, 621 F.Supp. at 1056–58; *United States v. Mid–South Music Corporation,* 624 F.Supp. 673, 676–78 (M.D.Tenn.1985).

■ 41. Section 7402(a) of the Code provides another basis for enjoining the defendants for interfering with the enforcement of the internal revenue laws. Section 7402, entitled Jurisdiction of district courts, provides in part:

> The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction. . . .

42. The language of § 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws. *United States v. Ernst & Whinney,* 735 F.2d 1296, 1300 (11th Cir.1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 814 (1985). It has been used to enjoin interference with tax enforcement even when such interference does not violate any particular statute. *Id.*

43. The broad powers of § 7402 have not been abridged by the enactment of § 7408, discussed above. To the contrary, in enacting § 7408, Congress intended:

> Of course, the court will continue to have full authority to act under its general jurisdiction (Section 7402) and will contin-

ue to possess the great latitude inherent in equity jurisdiction to fashion appropriate equitable relief.

\* \* \* \* \* \*

> The commencement of any action under this provision [i.e., Section 7408] does not in any way restrict the right of the United States to commence or carry on any other action against the organizer or seller.

(S.Rep. 494, above, at 269 1982 U.S.Code Cong. & Ad.News 1017).

■ 44. Defendants' conduct constitutes an undoubted interference with the internal revenue laws. The economically illusory promissory notes, combined with defendants' statements that the entire research fee is deductible, have caused investors to take deductions to which they are not entitled. The same is true as to their false statements regarding when the research was completed. The manpower and expense involved in locating investor returns claiming these improper deductions, auditing the returns, and seeking to collect the tax attributable to the deductions, impedes the proper functioning of the internal revenue system. As noted above, after the Internal Revenue Service challenged the investors' tax treatment of their investment in Coral, Campbell advised the investors to prepay a portion of their cruzeiro obligations with a small amount of cash. This was done so that investors could show income from their investment in Coral, in the hope that the Internal Revenue Service would not realize the reported income was a result of a "gain" on a foreign currency transaction. Injunctive relief under § 7202(a) is appropriate to prevent recurrence of these illusory promissory note transactions.

■ 45. The defendants urge they should be relieved from liability in this action because they relied upon the advice of their counsel. Reliance on a lawyer's opinion is not a safe harbor, however, if a reasonable person would know that the opinion does not reflect a prudent lawyer's serious efforts. *Mitchell v. Pidcock,* 299 F.2d 281, 287 (5th Cir.1962).

46. The evidence in this case strongly supports the conclusion that Campbell was the mastermind of virtually every aspect of the Coral program. Campbell, a licensed attorney and experienced businessman, provided a great deal of the information incorporated into the Mankoff legal opinion. He and Mankoff worked together to promote the Coral program. Mankoff is an investor in the Coral program. Campbell made changes in the tax opinion and ignored warnings from an attorney working with Mankoff about the impossibility of complying with the 1984 changes in the Code. As early as 1982, Campbell likewise ignored opinions by two independent tax experts objecting strongly to the validity of the Mankoff opinion. The court concludes that the defendants' claim of reliance on counsel—or anyone—is disingenuous.

47. To the extent that any of the foregoing paragraphs should be considered findings of fact, they are so designated.

### Conclusion

In sum, defendants have made gross valuation overstatements and false and/or fraudulent statements within the meaning of § 6700 of the Code. In addition, defendants have improperly interfered with the enforcement of the internal revenue laws by the Internal Revenue Service within the meaning of § 7402 of the Code. Injunctive relief is appropriate to prevent recurrence of this conduct.

Within fifteen days of this date, plaintiff shall present a proposed form of judgment consistent with this memorandum opinion.

SO ORDERED.